KUSKIN, J.T.C.
Plaintiff, Entenmann’s Inc., appeals the 1998 and 1999 assessments on property designated as Block 169, Lot 6 on the Tax Map of the Borough of Totowa and commonly known as 930 Riverview Drive. The assessment for each year under appeal was:
Land - • $ 3,539,900
Improvements - $ 7,834,100
Total - $11,374,000.
The Chapter 123 Ratio (N.J.S.A. 54:1-35a and -35b) for Totowa was 98.59% for 1998 and 101.59% for 1999.
The subject property is located in the 1-3 Industrial Zone in which the permitted uses include, but are not limited to, research laboratories, offices and offices accessory to industrial use, manufacturing and assembly of products, and warehousing. The parties have stipulated that the subject land contains 16.44 acres and that, as of assessment dates of ■October 1, 1997 and October 1, 1998, the area of the building on the property was 280,300 square feet, consisting of a part one-story and part two-story front portion containing 106,220 square feet (“front portion”) and a one-story rear portion containing 174,080 square feet (“rear portion”). The front portion included a small retail outlet on the first floor and 38,500 square feet of office space on the second floor. This office space was accessible only via a long stairway, there being no elevator. Plaintiff used the building as a bakery, with related office, storage, and shipping and receiving areas, until 1996 when plaintiff terminated baking operations at the subject property. *543 Plaintiff shifted the operations to another facility but continued to use the property as an office, depot, and retail outlet. Plaintiff then made a decision to sell the property, considered re-locating the remaining uses, but decided to lease space at the property sufficient for continuance of plaintiffs office, depot, and retail outlet operations.
Plaintiff sold the subject property to 930 North Riverview Associates, L.L.C. on March 25, 1998 pursuant to an Agreement dated March Í9, 1998 which incorporated provisions of a Letter of Intent signed November 25, 1997. The purchase price was $4,525,000. The sale was conditional on a leaseback to plaintiff of the front portion of the building, plus the exclusive use of at least 225 designated parking spaces for vehicles of employees and retail customers, and parking for fifty trucks. The lease to plaintiff provided for a fifteen year initial term at an average net rent over the term of $7.81 per square foot, and an average net rent over the first ten years of the term of $7.42 per square foot. The leased premises were to be used as an “office and depot for [plaintiffs] business and retail outlet for sale of the Company’s baked goods.” The lease granted to plaintiff exclusive use of 276 parking spaces (as reflected on the plan attached to the lease) and the non-exclusive right to use the remaining outside areas of the property (subject to the landlord’s right to designate parking for the exclusive use of another tenant at the building).
The lease contemplated the performance of certain renovation work in connection with plaintiffs occupancy of the front portion of the building and obligated the landlord to pay the first $1,700,-000 of the cost of the work plus the following amounts:
X) soft costs (undefined) on the first $400,000 of work;
2) the cost of installation of a passenger elevator;
3) the cost of installation of demising walls; and
4) the cost of cosmetic upgrading of the facade and the entrance to the office and retail areas.
The lease required plaintiff to pay the balance of the cost of the work.
*544 Between mid-June and July 1999, as part of the renovation and conversion of the rear portion of the building to industrial and office use, 930 North Riverview Associates demolished 52,755 square feet of space, leaving a rear portion area of 121,325 square feet.
In support of its claim for a reduction in the 1998 and 1999 property tax assessments on the subject property, plaintiff presented the testimony of an engineer as to the costs of proposed renovation, conversion, and tenant fit-up work to the front and rear portions of the building, and valuation testimony of an appraisal expert. The appraiser used the sales comparison and income approaches, gave most weight to his sales comparison approach, and determined a value of $4,551,000 for the property as of the applicable assessment dates of October 1, 1997 and October 1, 1998. Defendant presented the testimony of an appraisal expert who used only the income approach, and determined a value for the property of $9,310,000 as of October 1, 1997 and $9,920,000 as of October 1,1998.
At the conclusion of plaintiffs case, defendant moved to dismiss under R. 4:37—2(b). I denied the motion, having determined that plaintiff overcame the presumption of validity which attached to the assessments under appeal. Pantasote Co. v. City of Passaic, 100 N.J. 408, 412-13, 495 A.2d 1308 (1985). Consequently, I must now weigh and evaluate all the evidence, and determine whether the plaintiff has demonstrated, by a preponderance of the evidence, that the assessment should be adjusted. I need not redetermine whether the presumption has been overcome. MSGW Real Estate Fund, L.L.C. v. Mountain Lakes Bor., 18 N.J.Tax 364, 378 (Tax 1998).
In Ford Motor Co. v. Edison Tp., 127 N.J. 290, 604 A.2d 580 (1992), the Supreme Court articulated the Tax Court’s responsibility to find value as follows: ‘When an original assessment is unreliable, the Tax Court may not invoke its presumptive correctness and must establish value, even if it means coming to a determination contrary to both experts.” Id. at 313, 604 A.2d 580 (citation omitted). Because the appraisers for both parties deter *545 mined a value significantly below the assessment on the subject property, I conclude that the assessment is unreliable and will proceed to establish value even though, as I will discuss in detail below, I find serious deficiencies in the proofs, particularly plaintiffs proofs. In making my value determinations, I am cognizant of the following guidelines articulated by the Appellate Division: 1) “the trial judge as the fact finder is not bound by the [valuation opinion] of the experts on either side. Just as a jury, a judge may adopt ‘so much of its as appears sound, reject all of it, or adopt all of it.’ ” Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978) (citation omitted), certif. denied, 79 N.J. 483, 401 A.2d 239 (1979); and 2) “[t]he right of [a] plaintiff to a fair valuation is not to be lost because of a difficulty in quantifying it.” City of Newark v. Jefferson Tp. 13 N.J.Tax 217, 222 (App.Div.1992), certif. denied, 133 N.J. 430, 627 A.2d 1137 (1993). I am also cognizant of the admonition by the Supreme Court in Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 491 A.2d 1247 (1985) that “the volume of information that is required to support an expert’s opinion must be kept within practical and realistic limits.” Id. at 280, 491 A.2d 1247.
For local property tax assessment purposes, property must be valued at its highest and best use. Highest and best use is a function of the market.
The highest and best use of a specific parcel of land is not determined through subjective analysis by the property owner, the developer, or the appraiser; rather, highest and best use is shaped by the competitive forces within the market where the property is located. Therefore, the analysis and interpretation of highest and best use is an economic study of market forces focused on the subject property.
Market forces also shape market value, so the general data that are collected and analyzed to estimate property value are also used to formulate an opinion of the property’s highest and best use as of the appraisal date. In all valuation assignments. value estimates are based on use. The highest and best use of a property to be appraised provides the foundation for a thorough investigation of the competitive positions of market participants. Consequently, highest and best use can be described as the foundation on which market value rests.
[Appraisal Institute, The Appraisal of Real Estate 298 (11th ed. 1996)(footnote omitted).]
The highest and best use of a property as improved also depends on physical considerations such as size, design, and condition. The condition of the property and its ability to continue in its current use may be relevant. If the property *546 should be converted to another use, the cost of conversion must be analyzed in light of the returns to be generated by the new use. Obviously, the costs of conversion depend on the property’s existing physical condition and location.
[Id. at 305, 491 A.2d 1247.]
The four criteria for determining highest and best use are whether the use is 1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive. Id. at 303-306, 491 A.2d 1247. See also Ford Motor Co. v. Edison Tp., supra, at 300-301, 604 A.2d 580. In discussing the criterion of financial feasibility as applied to income producing properties, The Appraisal of Real Estate states as follows:
In determining which uses are legally permissible and physically possible, an appraiser eliminates some uses from consideration. Then the uses that meet the first two criteria are analyzed further. If the uses are income-producing, the analysis will study which are likely to produce an income, or return, equal to or greater than the amount needed to satisfy operating expenses, financial obligations, and capital amortization. All uses that are expected to produce a positive return are regarded as financially feasible... Analyses of supply and demand and of location are needed to identify those uses that are financially feasible and, ultimately, the use that is maximally productive.
To determine the financial feasibility of potential income-producing uses, the appraiser estimates the future gross income that can be expected from each. Vacancy and collection losses and operating expenses are then subtracted from each gross income to obtain the likely net operating income (NOI) from each use. A rate of return'on the invested capital can then be calculated for each use. If the net revenue capable of being generated from a use is sufficient to satisfy the required rate of return on the investment and provide the requisite return on the land, the use is financially feasible.
[The Appraisal of Real Estate, supra at 305.]
In order to select the maximally productive use for an income producing property, “the available uses are generally analyzed in terms of their potential rates of return and perceived income stability.” Id. at 308, 604 A.2d 580.
The determination of highest and best use in the matter before me requires resolution of the following issues: 1) whether the 52,755 square feet of building area demolished in 1999 by the purchaser of the property contributed value to the property as of October 1, 1997 and October 1, 1998; 2) the proper allocation of building space to office use; 3) the appropriate number and size of tenant spaces in the building; and 4) the nature and extent of renovations warranted to convert the-subject property from a *547 bakery use to a multiple-tenant industrial (warehouse) building with related office space.
Plaintiffs appraiser determined that the highest and best use of the subject property was as a renovated industrial/office use, with 52,755 square feet of the rear portion of the building demolished, with 50% of the front and rear portions of the building allocated to office space, and with the front portion occupied by one tenant, and the rear portion occupied by one tenant or by two tenants, each leasing approximately 60,000 square feet. The appraiser further determined that the renovation/conversion and fit-up costs necessary to achieve this highest and best use equalled $9,441,498.
Defendant’s appraiser determined a highest and best use of continuation of industrial use, but conversion of the building from a single-tenant bakery to multiple-tenant, general industrial/warehouse use. He concluded that no demolition of building area was warranted, because the entire rear portion of the building contributed value to the property, that the appropriate allocation to office space was 86% in the front portion of the building and 10% in the rear portion, and that the appropriate number of tenants was three in the real' portion, each occupying approximately 58,000 square feet, and one in the front portion. He further concluded that the renovation costs necessary to achieve his highest and best use equalled approximately $2,000,000.
The analysis of highest and best use by defendant’s appraiser is more convincing than the analysis by plaintiffs appraiser. Plaintiffs appraiser based his determination of highest and best use on the following factors: 1) the decision by 930 North Riverside Associates, L.L.C., the purchaser of the subject property, to demolish 52,755 square feet of the rear portion of the building; 2) the decision by plaintiff, in connection with its leaseback of space, to use 50% of the front portion for office space (as discussed later, plaintiff apparently has not implemented that decision); and 3) the use by plaintiffs engineer of a 50% office allocation in his estimate of the cost of renovating and converting the rear portion. As set forth above, the “subjective analysis” of a property owner is not a sufficient basis for an appraiser’s determi *548 nation of highest and best use. The Appraisal of Real Estate, supra, at 305. Plaintiffs appraiser made no adequate independent analysis or investigation to ascertain whether the property owner properly determined the highest and best use of the property. A representative of the construction manager for the purchaser testified at his deposition that the purchaser decided to demolish 52,755 square feet based on advice by brokers that the demolition was necessary in order to provide sufficient parking and appropriate dimensions for use of the real' portion of the building for office/flex space occupied by one to seven tenants. Plaintiffs appraiser had no knowledge of the identity of the brokers, or what analysis, if any, the brokers or the purchaser performed, nor did the appraiser make his own analysis of appropriate building dimensions or parking requirements.
Plaintiffs engineer testified that he used a 50% office allocation for the rear portion of the building only because plaintiff proposed to use 50% of the front portion for offices. Plaintiffs appraiser made no market study to support his 50% allocation to office space other than determining that one of his eight sale comparables, located in Hunterdon County, distant from the subject property, contained 53.6% office and lab space, and another sale comparable, also in Hunterdon County, contained 42.5% finished space which included a cafeteria, kitchen, and executive dining room of undisclosed size. His other sales (excluding the subject property) contained office areas, as a percentage of total area, of 11.39%, 35%, 18%, 16%, and 24.5%, respectively. The lease comparables used in the appraiser’s income approach (other than the leaseback to plaintiff) contained office space allocations of 19%, 33%, 14%, and 26% respectively. Two other lease comparables which the appraiser described, but did not include in his analysis, reflected office space allocations of 5% and 35%, respectively.
In connection with his highest and best use analysis, plaintiffs appraiser accepted the renovation/conversion and fit-up costs estimated by plaintiffs engineer totaling $12,109,498. These costs assumed two tenant spaces in the rear- portion of the building. The appraiser concluded that $2,668,000 of the costs was attribut *549 able to satisfying specific tenant requirements and, therefore, should be excluded from the appraiser’s analysis. Plaintiffs appraiser, therefore, used costs of $9,441,498, based on demolition of 52,775 square feet of building area, an allocation of 50% of the remaining area to office space, and one or two tenant spaces in the rear portion of the building.
Plaintiffs appraiser testified that he did an analysis of highest and best use with office space constituting less than 50% of total area, and concluded that smaller percentages of office space produced lower values. The reliability of this analysis is undercut by the appraiser’s failure to present any details of the analysis and by his inability to quantify accurately the reduction in renovation/conversion and fit-up costs which wmild accompany a reduction in the office space allocation. The appraiser did not contact plaintiffs engineer in order to determine this cost reduction.
Additional doubt as to the reliability of the analysis results from the income approach valuation by plaintiffs appraiser which indicated that, for 930 North Riverview Associates, an investment in the property of $13,966,498 (purchase price of $4,525,000 plus renovation/conversion and fit-up costs of $9,441,498) produced a maximum value of only $14,861,505. If the full costs estimated by plaintiffs engineer were considered, the investment required to produce this value would be $16,634,498.
Defendant’s appraiser made his highest and best use determination based primarily on conversations with industrial brokers. The appraiser provided specifics as to the identity of the brokers and the information communicated to him by them, including offers to lease the rear portion of the building without any demolition. One offer included the entire rear portion, another related to 100,000 square feet, and a third related to 60,000 square feet. The appraiser also spoke to tenants of lease comparables he used in his income approach. Based on this research, he determined that “more than adequate demand” existed for light industrial space in units of approximately 58,000 square feet, with 10% of the space devoted to office. He regarded the decision by the purchaser of the building to demolish 52,755 square feet of the *550 rear portion, and proceed with an expensive conversion of the remaining area to office/flex space, as unnecessary and much riskier than simply renovating the building for general industrial or warehouse use. The appraiser concluded that the purchaser could afford to take this additional risk because the leaseback of the front portion of the building to plaintiff provided a stable income flow far greater than necessary to support the $4,525,000 purchase price.
Defendant’s appraiser concluded that the highest and best use of the property was for division into four spaces, one space constituting the front portion and three spaces in the rear portion. Under this analysis, the front portion would remain in the configuration that existed on the assessment dates with. 36% office, and each of the three spaces in the rear portion would contain 10% office. For this use, the appraiser determined that renovation and fit-up costs of approximately $2,000,000 would be required, as compared to costs of $9,441,498 used by plaintiffs appraiser. As a result, under the analysis by defendant’s appraiser, a total investment of $6,525,000 (the purchase price plus $2,000,000) produced a value ranging between $9,310,000 and $9,920,000.
The highest and best use analysis by defendant’s appraiser has significant deficiencies. The appraiser did not make an independent analysis of the costs of conversion of the rear portion of the building to office/flex space with 50% office area, or conversion of the front portion to 50% office area, nor did he analyze the financial return and value which would result from such conversions. The appraiser’s determination that “more than adequate demand” existed for his highest and best use model does not lead inexorably to the conclusion that other models would not produce a higher value. As set forth in The Appraisal of Real Estate, supra, at 305, various uses which are legally permissible, physically possible, and financially feasible must be tested to determine which produces the highest value. Furthermore, although the appraiser opined that division of the rear portion of the building into three tenant spaces was physically possible, he made no attempt to lay out the space and thus confirm his opinion. On *551 balance, however, the appraiser’s analysis of highest and best use is far more reflective of “market forces focused on the subject property,” Id. at 298, than the analysis by plaintiffs appraiser. Accordingly, I accept the highest and best use determination by defendant’s appraiser and will value the subject property based on 280,300 square feet of area, configured into the following four tenant spaces: a) the front portion of the building consisting of one tenant space and containing 106,220 square feet, including 38,500 square feet of second floor office area, and b) the rear portion containing 174,080 square feet divided into three tenant spaces, each having an area of approximately 58,000 square feet with 10% of that area allocated to office space. I further accept the opinion of defendant’s appraiser that the renovation costs which he determined, with the adjustments discussed below, would be necessary and appropriate to achieve this highest and best use.
Only defendant’s appraiser presented valuation evidence consistent with the highest and best use I have determined. As described earlier, the appraiser valued the subject property by using only an income approach. Plaintiffs appraiser also used an income approach. The impact of highest and best use on the respective income approach analyses of the two appraisers relates primarily to their respective determinations of gross potential rent and renovation costs. The remaining components of the income approach are the vacancy and collection loss allowance, landlord expenses, and capitalization rate. The analyses of the vacancy and collection loss allowance and capitalization rate presented by plaintiffs appraiser were based on statistical data not significantly influenced by his specific highest and best use determination, and, as discussed below, the appraiser’s analysis of landlord expenses was consistent with the analysis by defendant’s appraiser. Based on the preceding discussion, in determining a value for the subject property under the income approach, I will rely heavily on the determinations by defendant’s appraiser as to all components of the approach, but I also will weigh the determinations by plaintiffs appraiser as to vacancy and collection loss allowance, landlord expenses, and capitalization rate. In addition, I will analyze *552 the adequacy of the renovation costs deducted by defendant’s appraiser.
In his determination of gross potential rent, defendant’s appraiser relied on seven comparable leases, all in Totowa. Six of the comparables were in the immediate vicinity of the subject property. The appraiser used the comparables to determine economic rent for the rear portion of the building (assuming 10% office area). He then determined economic rent for the front portion by adjusting his rear portion rent upward by 15.85% to reflect the greater percentage of office area in the front portion (36%), the location of this office area on the second level without elevator service, the interior loading docks in the front portion (the rear portion had only exterior loading doors), and the size of the front portion (106,220 square feet compared to rear portion units of approximately 58,000 square feet each). His economic rent as of October 1, 1997 was $4.10 per square foot for the rear portion and $4.75 per square foot for the front portion. For October 1, 1998, he increased his October 1, 1997 total economic rent, $1,218,273, by 2.5% to $1,248,729.
One of seven leases upon which defendant’s appraiser relied is dated February 26, 1992, over five and one-half years before the first valuation date under appeal. I give no weight to this lease because of its remoteness in time and because the appraiser adjusted the lease by 42% (without regard to plus and minus signs on the adjustments). The magnitude of the adjustment in itself suggests lack of comparability. See Global Terminal & Container Service v. Jersey City, 15 N.J.Tax 698, 704 (App.Div.1996); M.I. Holdings Inc. v. Jersey City, 12 N.J.Tax 129, 137 (Tax 1991). Of the six leases remaining for consideration, one included an area of 126,996 square feet and another an area of 25,000 square feet. I give least weight to these leases because of their size difference from the assumed 58,000 square foot tenant spaces in the rear portion of the subject building. The lease data presented by defendant’s appraiser does not support, and, to some extent appears to contradict, the appraiser’s adjustments to all six leases for time/market conditions. As a result, I reject this adjustment. *553 After eliminating this adjustment, the four remaining leases on which I primai’ily rely reflect per square loot net rents, after adjustments for size, quality, and condition (which I find to be reasonable),' of $3.80, $4.03, $4.09, and $4.20. The remaining two leases reflect per square foot net rents of $3.97 and $4.30. The appraiser’s adjustment for the percentage of office space in his lease comparable No. 2 (the Perugina lease) was disputed by plaintiff. I find that the adjustment was adequately supported by the appraiser’s testimony as to his inspection of the comparable. I conclude that the economic rent for the rear portion of the subject property as of October 1, 1997 was $4.10 per square foot, consistent with the determination by defendant’s appraiser.
The methodology used by defendant’s appraiser to determine economic rent for the front portion of the building was less than satisfactory. The appraiser should have made a separate analysis using leases comparable to a tenant space containing 106,220 square feet with 36% second floor office. In addition, the rent determined by defendant’s appraiser should be adjusted upward because, as discussed below, I have determined that elevator access to the second floor offices is required. The record, however, provides no basis for such an adjustment and contains no evidence, other than that provided by defendant’s appraiser, on which to base a determination of economic rent for the front portion of the subject building. The determination of economic rent by plaintiffs appraiser, $7.42 per square foot, is not applicable because this rent assumes that 50% of the front portion of the building constitutes fully renovated office area, with the elevator installation being only part of the renovations. Consequently, I will accept the 15.85% adjustment made by defendant’s appraiser, resulting in economic per square foot net rent for the front portion of the building, as of October 1,1997, of $4.75.
I find no adequate basis in the record for the 2.5% increase in rents from October 1, 1997 to October 1, 1998 projected by defendant’s appraiser. 1 conclude, therefore, that the economic rents for the subject property as of October 1, 1998 remained at *554 $4.10 per square foot for the rear portion and $4.75 per square foot for the front portion.
Defendant’s appraiser provided no support, statistical or otherwise, for his vacancy and collection loss allowance of 5%. Plaintiffs appraiser provided statistical support for an allowance of 10%. Consequently, I accept 10% as the appropriate allowance.
The expenses deducted by the two appraisers were very similar. Both used a reserve expense of 3% of effective gross income, and both used a combined management and leasing commission expense of 8% of effective gross income. Since both appraisers used aggregate expenses of 11% of effective gross incotne, I will accept this percentage.
The next step in an income approach analysis is the selection of. a capitalization rate. Both appraisers used a band of investment technique to determine them respective rates. See Hull Junction Holding Corp. v. Princeton Bor., 16 N.J.Tax 68, 80-81, 84-85 (Tax 1996) (explaining the band of investment technique). Defendant’s appraiser used a 9.12% rate as of October 1, 1997, and an 8.847% rate as of October 1, 1997. Plaintiffs appraiser determined rates of 9.5% as of October 1, 1997 and 9.1% as of October 1, 1998. In their respective band of investment analyses, both appraisers used a loan-to-value ratio of 70% and a 25-year mortgage amortization period. They differed in them selection of mortgage interest rates and equity dividend rates. Plaintiffs appraiser selected a mortgage interest rate of 8.25% as of October 1, 1997 and 8% as of October 1, 1998. His equity dividend rate was 10% as of October 1, 1997 and 9% as of Oetobér 1, 1998. Defendant’s appraiser selected a mortgage interest rate of 7.75% as of October 1, 1997 and 7.25% as of October 1, 1998. His equity dividend rate was 9.25% as of both valuation dates. The statistical data included in the appraisal reports indicates that, for industrial properties, mortgage interest rates ranged from 7.32% to 7.66% as of October 1,1997 and from 6.87% to 7.08% as of October 1, 1998. The data also indicates equity dividend rates as of both dates ranging from 9.07% to 9.39%.
*555 In analyzing the foregoing statistical data, I considered the following factors: a) the respective opinions of the appraisers; b) the age, size, and condition of the subject property; and c) the role of stability in assessments, see New Brunswick v. Division of Tax Appeals, 39 N.J. 537, 189 A.2d 702 (1963) (noting the inability of the assessment process to be “acutely sensitive” to minor fluctuations in rates of return and stating that “[t]he rate of return should reflect conditions for a reasonable span of years.” Id. At 550.) Based on such analysis, I conclude that the appropriate mortgage interest rate was 8% as of both October 1, 1997 and October 1, 1998, producing a mortgage constant, see Hull Junction, supra, at 102 (defining a mortgage constant), of 9.26%. I further conclude that the appropriate equity dividend rate was 9.25% as of both valuation dates. The resulting capitalization rate (rounded) is 9.26%.
The following summarizes the foregoing income analysis:
Gross Potential Rent
Front Portion - 106,220 sq. ft. x $4.75 = $ 504,545
Rear Portion - 174,080 sq. ft. x $4.10 = 713,728
$1,218,273
Less: Vacancy and Collection Loss Allowance -10% 121,827
Effective Gross Income (EGI) $1,096,446
Less: Expenses -11% of EGI $ 120,609
Net Operating Income $ 975,837.
Capitalizing $975,837 at 9.26% produces a value of $10,538,197 as of each valuation date.
Remaining for consideration is the amount to be deducted for renovations necessary to achieve the subject property’s highest and best use. As discussed above, I have rejected the cost deduction by plaintiffs appraiser because his deduction relates to *556 a highest and best use which I have also rejected. Defendant’s appraiser deducted costs, including entrepreneurial profit and overhead of 20%, of $1,980,000 as of October 1, 1997 and $2,010,-000 as of October 1, 1998. The appraiser acknowledged that he did not include separate costs for the following items:
1) a boiler serving the front portion of the building;
2) an elevator in the front portion;
3) an exit corridor in the front portion;
4) roof replacement for rear portion;
5) site work; and
6) facade work.
1 conclude that the costs determined by defendant’s appraiser must be increased to cover some of the foregoing items. Installation of a boiler for the front portion of the building was required to heat this portion as a separate leasing unit. Defendant’s appraiser testified that he assumed heating equipment had been installed before the valuation date. The cost of the boiler, $427,-100, should be deducted. The exit corridor is a fire safety factor and, therefore, its cost should be deducted. The record contains a cost estimate of $338,427 for the corridor and elevator combined. Plaintiffs engineer testified that installation of an elevator would be required by the Americans With Disabilities Act, 42 U.S.C.A. §§ 12101 to 12213 (West 1999), and by the local building codes. Under 42 U.S.C.A. § 12183(b) (West 1999), which provides that elevator installation is not required in “facilities that are less than three stories,” an elevator may not be required'in the subject property. However, I will accept the engineer’s interpretation of the statute and building codes, and will deduct the cost of the elevator installation.
The record contains no proof that replacement of the roof of the rear portion of the building was necessary. The construction manager for the purchaser of the property testified at length in his deposition concerning the roof. He discussed repairs which might be required, but made no mention of roof replacement. As to site work and facade work, I accept the testimony of defendant’s appraiser that additional site work and facade work costs are not necessary for his highest and best use (which I have *557 accepted). Plaintiff contended that the cost of removal of quarry tile from the rear portion of the building should be added to the renovation costs determined by defendant’s appraiser. I accept the appraiser’s testimony that such cost is included in his cost for leveling floors.
Based on the foregoing, the renovation costs for each year under appeal must be increased by $765,527, resulting in total costs of $2,745,527 as of October 1, 1997 and $2,775,527 as of October 1, 1998. Deducting these costs from the income approach value $10,538,197 previously determined results in fair market values for the subject property of $7,792,700 (rounded) as of October 1, 1997 and $7,762,700 (rounded) as of October 1, 1998.
As described in the preceding discussion, I have valued the subject property based essentially on the valuation proofs presented by defendant because plaintiffs proofs assumed a highest and best use which I have rejected. My rejection of the highest and best use analysis of plaintiffs appraiser is not, however, the only basis for my disregard of most of plaintiffs proofs. The proofs were deficient and defective in other significant respects.
Plaintiffs appraiser, as noted earlier, valued the subject property using the sales comparison and income approaches. In his sales comparison approach, he valued the property in its unrenovated condition as of the valuation dates of October 1, 1997 and October 1, 1998. This valuation analysis is inconsistent with the appraiser’s determination of highest and best use for the property as a “renovated industrial/office use” (emphasis supplied). The appraiser implicitly assumed, without explanation, analysis or proof, that the value of the property unrenovated would be the same as its value after renovations, less the cost of the renovations. The accuracy of the assumption is neither self-evident nor supported by the appraiser’s appraisal report. As of October 1,1997 the appraiser’s income approach indicated a value, after deduction of renovation costs, approximately $250,000 higher than his sales comparison approach value. As of October 1, 1998, his income approach value of $5,420,000 was almost $900,000 higher than his sales comparison approach value. As discussed *558 below, I conclude that the appraiser’s deductions for renovations/eonversion and fit-up costs were excessive. Any reduction in these costs produces an even greater discrepancy between the unrenovated value demonstrated by the appraiser’s sales comparison approach and the renovated value demonstrated by his income approach.
Even if the reliability of the sales comparison approach used by plaintiffs appraiser were not undercut by his deviation from his highest and best use determination, the approach nevertheless is flawed because of deficiencies in the sales data. Two sales are located in Branchburg, Hunterdon County, approximately forty-five miles from the subject property. Another sale is in Raritan, Somerset County, over thirty miles from the subject property. The distance of these sales from the subject property suggests a lack of comparability. The appraiser adjusted two of the sales by 50% (without regard to whether the adjustments-were positive or negative) and the third sale by 30%. The magnitude of these adjustments also suggests a lack of comparability. Furthermore, each of these sales was from an owner-user to an owner-user. Such use by a single owner/occupant is different from the multi-tenant highest and best use determined by plaintiffs appraiser for the subject property. See MSGW Real Estate Fund, LLC v. Mountain Lakes Bor., supra, 18 N.J.Tax at 399 (distinguishing between sales to owner-users and sales to investors for multi-tenant occupancy). 18 N.J.Tax 364, 393. This difference alone significantly vitiates comparability. See Newport Center v. Jersey City, 17 N.J.Tax 405, 419 (Tax 1998) (discussing the significance of the highest and best use of comparable sales).
The remaining sales upon which plaintiffs appraiser relied consisted of the sale of the subject property to 930 North River-view Associates, L.L.C. and sales in East Brunswick, Oceanport, Woodbridge, and Totowa. The sale properties in East Brunswick, Oceanport, and Woodbridge, were, respectively, approximately thirty-five miles, fifty miles, and thirty miles from the subject property. The property in East Brunswick was purchased for *559 conversion from a bakery to flex space. The appraiser acknowledged that the cost of conversion would affect the purchase price, but he did not know what the buyer estimated the conversion cost would be. The impact of location on the reliability of the Ocean-port sale is not ameliorated by the determination by plaintiffs appraiser that rents in the building were similar to the rent payable under plaintiffs leaseback agreement. Such similarity may have been accidental, and, in any event, the rents in one building do not demonstrate that Oceanport and Totowa were similar and competitive markets.
The reliability of the Oceanport sale price of $5,500,000 as an indicator of the fair market value of that property is further impaired by extensive deposition testimony from representatives of the seller which established that the seller’s motivation was to dispose of an excess property. The property was not adequately marketed or exposed to the market, and the seller did not have the property appraised before setting a price. The seller wanted a quick sale in order to remove a non-performing asset from its books. An in-house attorney for the seller described the Ocean-port property as “superfluous” to the seller, and testified that the sale was driven by a need for cash. That the $5,500,000 sale price did not represent the fair market value of the property is essentially confirmed by the resolutions of appeals of the 1997 and 1998 property tax assessments on the property. The appeal for 1997, the year in which the property sold, was settled for an assessment of $10,119,000. The appeal of the 1998 assessment of $10,619,000 was withdrawn.
The sale in Woodbridge is, as noted above, distant from the subject property and required adjustments of 35%. Both factors suggest lack of comparability. Plaintiffs appraiser made no effort to establish that the market in Woodbridge was similar to, or competitive with, Totowa. Furthermore, the sale was from an owner-user to an owner-user, and, therefore, the use of the property was different from the multi-tenant highest and best use which the appraiser determined for the subject property.
*560 The sale in Totowa, after adjustment, reflected a price of $26.57 per square foot, over 30% higher than the $20 per square foot value determination by plaintiffs appraiser under his sales comparison approach (the value I have determined averages $27.75 per square foot for the two years under appeal). This sale was also from an owner-user to an owner-user. Although plaintiffs appraiser, based on his inspection of the sale property approximately three years after the sale date, testified that the property was in a physical condition superior to the subject property, defendant’s appraiser, based on conversations with a representative of the purchaser, testified that the property was in poor physical condition on the date of sale. This conflict in testimony raises doubts as to the accuracy of the analysis of the sale by plaintiffs appraiser.
The final, and apparently most influential, sale considered by plaintiffs appraiser was the sale of the subject property, which the appraiser regarded as an arm’s length transaction unaffected by any special financial considerations. The evidence demonstrated, however, that, although at arm’s length, the sale is not a reliable indicator of the value of the subject property for tax assessment purposes for the following reasons:
1) Plaintiff failed to demonstrate that the property was adequately marketed or exposed to the market. Evidence as to the participation of two different brokers indicated that the primary responsibility of the first broker was to find an alternate location for plaintiff, and not to market the subject property for sale. The primary responsibility of the second broker was to obtain tenants for the purchaser.
2) The property was sold because plaintiff decided to shift baking operations to another facility, thus making the property an excess property to the plaintiff.
3) Plaintiff was unwilling to invest any money in the building even if marketability would be enhanced, and, therefore, made no analysis of the potential increase in sales price which could be achieved by such an investment.
4) The sale included a leaseback, and the Manager of Real Estate for plaintiff testified in his deposition that “the combination of the terms of the lease, the terms of the tenant improvement and the cash value of the purchase price is what we agreed to overall as the value of the property.”
Based on the foregoing factors, I am unable to determine what significance, if any, to attribute to the deed price of $4,525,000 for the subject property. See Glen Wall Assocs. v. Wall Tp., supra, *561 99 N.J. at 282, 491 A.2d 1247 (1985) (explaining that the sale price for a property may not reflect fair market value if special factors influenced the price).
The income approach of plaintiffs appraiser is no more reliable than his sales comparison approach. As discussed above, I have considered certain statistical data included in the appraiser’s income approach relating to vacancy and collection loss allowance and capitalization rate and have considered his determination of landlord expenses. However, the appraiser’s determinations of economic rent and renovation/conversion and fit-up costs do not merit consideration. Not only were these determinations strongly influenced by his selection of a highest and best use which I have rejected, but also the analytical basis for each determination contained significant deficiencies.
Plaintiffs appraiser analyzed five comparable leases as the basis for his determination of economic rent. Ultimately, he accepted, as economic rent, the average rent for the first ten years of the term of the leaseback to plaintiff, and described the other four comparables as supporting this conclusion. As described above, however, the leaseback rent was part of the sale-leaseback package. In the context of that package, I cannot determine the significance of the rent, just as I could not determine the significance of the sales price.
Of the remaining four lease comparables, three involved leases of space more than twice as large as each of the two rental units which plaintiffs engineer assumed in his analysis of renovation/conversion and fit-up costs for the rear portion of the subject building. Plaintiffs appraiser made no size adjustment to these comparables. The appraiser testified that, for purposes of his income approach, he assumed only one tenant space, even though he deducted renovation/conversion and fit-up costs for two spaces. He ignored this inconsistency and maintained that no significant effect on the accuracy of his determination of economic rent resulted from either 1) his failure to adjust (presumably upward) the rent indicated by the larger comparables to reflect the two smaller rental units which were the basis for his cost deduction, or *562 2) his failure to adjust (presumably downward) the costs of renovation/conversion and fit-up for two rental units to reflect only the costs necessary for the one larger rental unit which was the basis for his analysis of his lease comparables.
Furthermore, plaintiffs appraiser failed to establish that the condition of any of the four comparable properties was similar to the condition of the subject property after the projected renovation/conversion and fit-up work had been completed. The appraiser noted, and adjusted for, certain physical differences between each of the comparables and the subject property, but he failed to address the issue of whether the over-all condition of the subject property, after the expenditure of $9,441,498, would be superior to that of the lease comparables. The buildings in which the lease comparables were located ranged in age, as of October 1, 1997, from twelve to twenty-nine years, and plaintiffs appraiser did not testify as to any recent renovations.
Plaintiffs appraiser also failed to support adequately his deduction of $9,441,498 in renovation/conversion and fit-up costs. His basis for calculation of the costs was adequately established, but the necessity for, and likelihood of, the expenditures was not. The appraiser derived these costs from estimates prepared by plaintiffs engineer dating back to April 1999. The estimates were not adjusted to reflect costs as of the October 1, 1997 and October 1, 1998 valuation dates. Additionally, and more importantly, the actual budget for certain items of work was substantially lower than the engineer’s estimate, and certain items of work included in the cost estimate may not be necessary and may not be performed. The cost estimate for site work used by plaintiffs appraiser was $1;575,111. The budget for this work was $970,000, and, by December 1999, only approximately one-half of this amount had been spent. The appraiser’s cost deduction included $861,619 for a new roof on the rear portion of the subject building. The construction manager for 930 North Riverview Associates, the purchaser of the property, testified that roof repairs would be required, mainly relating to roof penetrations made in connection with other renovation work, but made no mention of roof replace *563 ment and did not include such replacement in a renovation budget he prepared at his deposition. The appraiser’s cost deduction included $3,774,389 for tenant fit-up in the rear portion of the building. The purchaser’s construction manager, at his deposition, gave a rough estimate of approximately $2,500,000 for this work. The appraiser’s cost estimate included $1,825,000 for renovation of the interior of the front portion of the building. As of December 1999, this work had not been contracted for and the scheduling on the work was within the control of plaintiff which, apparently, did not regard the work as essential for its occupancy of the leaseback space.
The foregoing factors cast serious doubt on the accuracy of the cost estimates which plaintiffs appraiser accepted and deducted. Further doubt results from the appraiser’s deduction of one-half of the engineer’s cost estimate for tenant fit-up work. This estimate totalled $5,336,000. As discussed above, the appraiser assumed, without analyzing the components of the estimate, that one-half of the costs would be attributable to basic building finish and the balance attributable to specific tenant requirements. I have no basis for deciding whether the sum of $2,668,000 deducted by the appraiser is reasonable, excessive, or insufficient.
In the absence of an accurate determination of the renovation/conversion and fit-up costs required for the highest and best use of the subject property assumed by plaintiffs appraiser, the appraiser’s income approach is unusable as a basis for valuing the subject property.
For all of the foregoing reasons, judgment will be entered reducing the assessment on the subject property based on a fair market value of $7,792,700 for tax year 1998 and $7,762,700 for tax year 1999. For each year, the ratio of assessed value to fair market value exceeds the upper limit of the Chapter 123 common level range. For tax year 1998, the Chapter 123 Ratio was 98.59%. Accordingly, judgment will be entered reducing the 1998 assessment to $7,682,800. N.J.S.A. 54:51A-6(b). For 1999, the Chapter 123 Ratio was 101.59%. Accordingly, judgment will be entered reducing the 1999 assessment to $7,762,700. N.J.S.A. *564 54:51A-6(c). See Passaic St. Realty Assoc., Inc. v. Garfield, 13 N.J.Tax 482, 485 (Tax 1994) (explaining that, when the Chapter 123 ratio exceeds 100%, the assessment equals fair market value). Counsel shall advise the court within ten days as to any agreement relating to the allocation of these assessments between land and improvements. If written confirmation of such agreement is not received within the ten day time period, the assessments will be allocated as follows:
For tax year 1998 - Land - $3,539,000
Improvements - $4,142,900
Total $7,682,800
• For tax year 1999 - Land - $3,539,900
Improvements - $4,222,800
Total $7,762,700.