

# TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL
OF THE TAX COURT COMMITTEE ON OPINIONS**

July 15, 2022

Joseph E. Bock, Jr., Esq.
Spiotti & Associates, LLC
612 Godwin Avenue
Midland Park, New Jersey 07432

Dominic DiYanni, Esq.
Eric M. Bernstein & Associates, LLC
34 Mountain Boulevard, Building A
Warren, New Jersey 07059-4922

> Re:  Buckley, Thomas and Karen v. Montclair Twp.
> Docket Nos. 004044-2019 and 002616-2020

Dear Mr. Bock and Mr. DiYanni:

This letter constitutes the court's opinion following trial in the above-referenced matters challenging the 2019 and 2020 tax year assessments on plaintiffs' single-family residence.[1]

For the reasons stated more fully below, the court affirms the 2019 and 2020 tax year local property tax assessments.

## I.  Procedural History and Factual Findings

Thomas and Karen Buckley ("plaintiffs") are the owners of the single-family residence located at 80 Lloyd Road, Montclair Township, Essex County, New Jersey. The property is identified on Montclair Township's municipal tax map as block 302, lot 7.01 (the "subject property"). For the 2019 and 2020 tax years, the subject property bore the following local property

---

[1]  Plaintiffs also filed Complaints under docket numbers 007962-2018 and 006816-2021, challenging the 2018 and 2021 tax year assessments. However, at the outset of trial, plaintiffs withdrew their Complaints for the 2018 and 2021 tax years. Montclair did not file Counterclaims under the aforesaid docket numbers for the 2018 or 2021 tax years.






tax assessment:

| | |
|---|---|
| Land: | $ 441,300 |
| Improvements: | $1,884,300 |
| Total | $2,325,600 |

The average ratio of assessed to true value, commonly referred to as the Chapter 123 ratio, for Montclair Township ("Montclair") for the 2019 tax year is 90.23% and for the 2020 tax year is 89.51%. See N.J.S.A. 54:1-35a(a). When the average ratio is applied to the local property tax assessment, the subject property's implied equalized value is $2,577,413, for the 2019 tax year and $2,598,145, for the 2020 tax year.

Plaintiffs timely filed direct appeals with the Tax Court challenging the 2019 and 2020 tax year local property tax assessments. Montclair filed counterclaims for the 2019 and 2020 tax years.

The matters were tried to conclusion over two days. During trial plaintiffs and Montclair each offered testimony from State of New Jersey certified general real estate appraisers, who were accepted by the court as experts in property valuation, without objection. Each expert prepared an appraisal report that was admitted into evidence by the court.

Based on the evidence presented, the court concludes that the subject property is a 3½-story detached Italian villa style, single-family residence constructed in 1916.[2] The subject property's lot is rectangular shaped, containing 1.22-acres or 53,143 square feet, with approximately 266 feet of frontage along Lloyd Road and a depth of 225 feet. The lot rises steeply from Lloyd Road to its rear. The rear of the subject property abuts the Eagle Rock Reservation,

---

[2] Plaintiffs' expert's appraisal report characterized the property as a 2½-story residence, and Montclair's expert's appraisal report characterized it as a 3-story residence with a finished "Fourth Floor/Attic." During cross-examination plaintiffs' expert acknowledged that his appraisal report should have recited that the property is a 3½-story residence.






offering a private, park-like, tree-lined setting.[3] Due to the lot's topography, the first floor of the main residence is approximately twelve feet higher than Lloyd Road. Access to the property from Lloyd Road is provided by a curved paver driveway that leads to a flat circular parking area in front of the residence and a two-car detached garage on the eastern boundary of the residence. The circular parking area is anchored by a tiered fountain located in front of the residence.

The main residence has a gross living area of 7,705 square feet, consisting of approximately 17 rooms, 6 bedrooms, 7 full bathrooms, 2 half-bathrooms, and 4 fireplaces.[4] The main residence's first-floor features: (i) a large entry foyer with quarry tile flooring, a fireplace, arched and vaulted ceilings; (ii) a half-bath with terrazzo tile flooring; (iii) French doors leading into a temperature-controlled wine cellar with wine storage, and a built-in granite bar/tasting area; (iv) a family room; and (v) a laundry room.[5] The second-floor features: (i) a living room with hardwood flooring, coiffured ceilings, a fireplace, French doors opening onto a balcony, and dual marble staircases leading to the sunroom; (ii) a sunroom with marble flooring and arched casement windows; (iii) a library with wood-paneled walls and built-in bookcases; (iii) a half-bathroom; (iv) a living room with coiffured ceilings, quarry tile flooring and three sets of arched French doors opening onto Juliette balconies; (v) a beautifully appointed kitchen containing high-end features and finishes including ornate wood cabinetry, commercial-grade stainless steel appliances, a combination oven and cooktop surrounded by a curved stone hearth, granite countertops, an oversized island

---

[3] "The Eagle Rock Reservation is a 400+ acre park along the Watchung Mountains ridge line located between West Orange, Montclair and Verona. The 40-mile Lenape Trail . . . skirts the eastern edge of the park. The hiking trails and footpaths that crisscross the woodland (and sometimes boggy) areas of the park are friendly for hikers of all ages and abilities." See Eagle Rock Reservation, https://www.essexcountyparks.org/parks/eagle-rock-reservation (last visited July 11, 2022).

[4] Plaintiffs' expert opined that the subject property's main residence is comprised of 14 rooms.

[5] The family room and laundry room are accessed by a separate set of stairs.






featuring a separate sink and seating for four; (vi) a breakfast room with terrazzo tile flooring, vaulted ceilings, skylights, and built-in cabinetry; and (vii) a dining room with hardwood flooring, a fireplace and French doors leading onto a balcony.  The third-floor features: (i) a master bedroom with hardwood flooring, a fireplace, and French doors leading onto a balcony; (ii) a sitting room, adjoining the master bedroom, with French doors leading onto a balcony; (iii) separate his and her master bathrooms that include slate tile, tumbled marble, ceramic tile, partial wainscot, and built-in vanity areas; and (iv) four additional bedrooms with hardwood flooring, and en suite bathrooms containing a combination of tumbled marble, marble, and/or ceramic tile.  One of the third-floor bedrooms also has access to a balcony.  The fourth floor/attic features: (i) a bedroom with hardwood flooring; (ii) an exercise room with hardwood flooring; (iii) a cedar closet; and (iv) a full bathroom with tumbled marble and ceramic tile.  The main residence's basement is partially finished and features: (i) a home gym; (ii) a sauna; and (iii) exterior access.  The exterior of the main residence is finished in an off-white stucco and has a red Mediterranean-style tiled roof.  The subject property is listed on the National Registry of Historic Places.[6]

In addition, the subject property has a 1,696 square foot pool house, constructed in 2005, containing a full kitchen with stainless steel appliances, wood cabinetry, a center island, granite countertops, a living room, a solarium, a bedroom, a laundry room, 2 full bathrooms, 2 fireplaces, and a portico/bar with an outdoor kitchen.  The pool house is constructed on the lot's westernmost boundary overlooking an infinity pool with an attached spa.

The property features a beautifully manicured landscape, a koi pond, and a sports court/basketball court (containing an outdoor built-in height-adjustable basketball hoop).  Due to

---

[6] Plaintiffs' expert did not notice the plaque affixed to the property and thus, was unaware of the subject property's listing on the National Registry of Historic Places.






the parcel's sloping topography, a series of tiered brick and stone retaining walls are constructed alongside and to the rear of the main residence. The retaining walls create several terraced flat outdoor patios and grassy areas with seating affording a means of access to the detached garage, pool, pool house, koi pond, and sports court, and as Montclair's expert characterized it, "panoramic and unobstructed views of the New York skyline."[7]

Plaintiffs acquired the subject property by two separate deeds: (i) the main residence, formerly known as block 302, lot 7, under deed dated January 31, 2002, for reported consideration of $1,750,000; and (ii) the vacant adjoining lot, formerly known as block 302, lot 5, under deed dated January 31, 2002, for reported consideration of $350,000. Plaintiffs subsequently improved the vacant adjoining lot with the pool house, infinity pool, spa, koi pond, and sports court.

The subject property is in Montclair's R-O, One Family Residence District. Principal uses permitted include one-family detached dwellings, carriage houses (where qualified as a permitted use), and municipal facilities. Therefore, the subject property is a legally permitted and conforming use within the R-O zoning district.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J.

---

[7] The issue of whether the subject property possesses "unobstructed views of the New York skyline" was disputed by plaintiffs. Based on his discussions with plaintiffs, plaintiffs' expert offered that during the tax years at issue, the subject property's views were partially obstructed by three evergreen redwood trees located on the front apron of the property along Lloyd Road. According to plaintiffs' expert, the trees were maintained by Montclair. The trees were removed by Montclair after the valuation dates involved herein but prior to plaintiffs' expert's and Montclair's expert's inspections of the subject property.




Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. See Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

In evaluating whether the evidence presented meets the "cogent evidence" standard, the court "must accept such evidence as true and accord the plaintiff all legitimate inferences which can be deduced from the evidence." Id. at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The evidence presented, when viewed under the Brill standard "must be 'sufficient to determine the value of the property under appeal, thereby establishing the existence of a debatable question as to the correctness of the assessment.'" West Colonial Enters, LLC v. East Orange City, 20 N.J. Tax 576, 579 (Tax 2003) (quoting Lenal Properties, Inc. v. City of Jersey City, 18 N.J. Tax 405, 408 (Tax 1999), aff'd, 18 N.J. Tax 658 (App. Div. 2000)). "Only after the presumption is overcome with sufficient evidence . . . must the court 'appraise the testimony, make a determination of true value and fix the assessment.'" Greenblatt v. Englewood City, 26 N.J. Tax 41, 52 (Tax 2011) (quoting Rodwood Gardens, Inc. v. Summit City, 188 N.J. Super. 34, 38-39 (App. Div. 1982)).

Hence, even in the absence of a motion to dismiss under R. 4:37-2(b), the court is






nonetheless required to determine if the party challenging the tax assessment has overcome the presumption of validity. If the court concludes that a challenging party has not carried its burden, dismissal of the action is warranted, under R. 4:40-1, and the trial court need not engage in a further evaluation of the evidence to make an independent determination of value.

Affording plaintiffs all reasonable and legitimate inferences which can be deduced from the evidence presented, the court concludes that plaintiffs produced cogent evidence sufficient to overcome the presumption of validity. If accepted as true, the opinions of plaintiffs' expert and the facts upon which he relied raise a debatable question regarding the correctness of the subject property's 2019 and 2020 local property tax assessments.

However, concluding that the presumption of validity has been overcome does not equate to a finding that a local property tax assessment is erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992).

b.    Highest and Best Use

"For local property tax purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The determination of the highest and best use of a property is "the first and most important step in the valuation process." Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988), aff'd, 127 N.J. 290 (1992). The highest and best use analysis involves the "sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive." Clemente v. South Hackensack Twp., 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015).






Here, plaintiffs' expert and Montclair's expert both opined that the highest and best use of the subject property, as improved, was its current use as a single-family residence and, as vacant, was for residential single-family development. The court accepts the experts' highest and best use conclusions.

c.     <u>Valuation</u>

"There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." <u>Brown v. Borough of Glen Rock</u>, 19 N.J. Tax 366, 376 (App. Div. 2001) (citing Appraisal Institute, <u>The Appraisal of Real Estate</u> 81 (11th ed. 1996), <u>certif.</u> <u>denied</u>, 168 N.J. 291 (2001)). "[T]he answer as to which approach should predominate depends upon the facts in the particular case." <u>WCI-Westinghouse, Inc. v. Edison Twp.</u>, 7 N.J. Tax 610, 619 (Tax 1985), <u>aff'd</u>, 9 N.J. Tax 86 (App. Div. 1986).

The sales comparison approach derives an opinion of market value "by comparing properties similar to the subject property that have recently sold, are listed for sale, or are under contract." Appraisal Institute, <u>The Appraisal of Real Estate</u>, 377 (14th ed. 2013). The sales comparison approach involves a "comparative analysis of properties" and requires the expert to focus on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." <u>Id.</u> at 378. "When data is available, this [approach] is the most straight forward and simple way to explain and support an opinion of market value." <u>Greenblatt</u>, 26 N.J. Tax at 53 (citing Appraisal Institute, <u>The Appraisal of Real Estate</u>, 300 (13th ed. 2008)).

Both plaintiffs' expert and Montclair's expert employed the sales comparison approach to derive an opinion of the subject property's true market value as of each valuation date. Here the






court concludes, as did the experts, that the sales comparison approach is the most appropriate method to determine the subject property's fair or true market value.

### 1. Plaintiffs' expert

In conducting his sales comparison approach, plaintiffs' expert identified six residential home sales that took place between December 1, 2017 and October 24, 2019. Three sales were deemed comparable as of the October 1, 2018 valuation date, and four sales were deemed comparable as of the October 1, 2019 valuation date.[8] Plaintiffs' expert verified the terms of each sale by conferring with one of the real estate agents involved in each transaction and reviewing the property record cards. Plaintiffs' expert further offered that he reviewed the interior photographs contained on the multiple listing service website for each of his comparable sales.

The following chart identifies the six comparable sales and sets forth basic details regarding each property relied upon by plaintiffs' expert to fashion his adjustments as of the October 1, 2018 and October 1, 2019 valuation dates.

| Comparable | #1 | #2 | #3 | #4 | #5 | #6 |
|---|---|---|---|---|---|---|
| Location | 36 Stonebridge Road Montclair, NJ | 57 Undercliff Road Montclair, NJ | 147 South Mountain Ave. Montclair, NJ | 85 Upper Mountain Ave. Montclair, NJ | 209 South Mountain Ave. Montclair, NJ | 105 Union Street Montclair, NJ |
| Sale date | 12/1/2017 | 5/6/2018 | 8/1/2018 | 9/16/2019 | 8/14/2019 | 10/24/2019 |
| Sale price | $2,405,950 | $2,070,000 | $1,615,000 | $2,175,000 | $2,100,000 | $1,699,999 |
| Price psf | $342.24 psf | $329.57 psf | $264.15 psf | $332.57 psf | $311.57 psf | $262.18 psf |
| G.L.A. | 7,030 sq. ft. | 6,281 sq. ft. | 6,114 sq. ft. | 6,540 sq. ft. | 6,740 sq. ft. | 6,484 sq. ft. |
| Lot size | 2.61 acres | 1.18 acres | 0.54 acres | 0.94 acres | 0.83 acres | 0.44 acres |
| Bathrooms | 5 full – 1 half | 7 full – 3 half | 4 full – 1 half | 4 full – 2 half | 5 full – 3 half | 4 full – 1 half |
| Basement | Partially finished | Partially finished | Unfinished | Finished | Partially finished | Unfinished |
| Amenities | In-ground pool/pool house/tennis court | In-ground pool/pool house/tennis court | In-ground pool/carriage house/elevator | Carriage house | In-ground pool/pool house | Carriage house |

---

[8] Plaintiffs' expert relied on 147 South Mountain Avenue as evidence of the subject property's value as of the October 1, 2018 and October 1, 2019 valuation dates.






Plaintiffs' expert applied adjustments to the comparable sales to account for differences in: (i) skyline views, 5%; (ii) lot size, $4.00 per square foot; (iii) condition, 10%; (iv) full bathrooms, $50,000 per bathroom; (v) half bathrooms, $25,000 per bathroom; (vi) gross living area, $150 per square foot; (vii) basement finish, $25,000; (viii) in-ground pool, $75,000; (ix) tennis court, $50,000; and (x) elevator, $50,000. Plaintiffs' expert applied gross adjustments to his six comparable sales ranging from $219,750 to $760,765, and net adjustments ranging from -$308,265 to $458,150. After applying adjustments to the comparable sales, plaintiffs' expert's range of adjusted sale prices was: (i) $2,003,650 to $2,105,100,[9] as of the October 1, 2018 valuation date, and $2,003,650 to $2,441,000, as of the October 1, 2019 valuation date.

After reconciling the adjusted sales prices, plaintiffs' expert concluded the subject property's true or fair market value is $2,100,000, as of the October 1, 2018 valuation date, and $2,225,000, as of the October 1, 2019 valuation date.

2. Montclair's expert

In conducting his sales comparison approach, Montclair's expert identified eight residential home sales that took place between October 24, 2017 and October 24, 2019. Four sales were deemed comparable as of the October 1, 2018 valuation date, and four sales were deemed comparable as of the October 1, 2019 valuation date. Montclair's expert verified the terms of each sale by telephoning one of the real estate agents involved in the transactions and reviewing the property record cards. Montclair's expert further testified that he reviewed the interior photographs contained on the multiple listing service website for each of his comparable sales.

---

[9] Plaintiffs' expert's report stated that the net adjustments for 57 Undercliff Road were $33,600, resulting in an adjusted sales price of $2,133,600. However, during direct examination plaintiffs' expert testified that the net adjustments should be $35,100, resulting in an adjusted sales price of $2,105,100.






The following charts identify the eight comparable sales and set forth basic details of each property relied upon by Montclair's expert to fashion his adjustments as of the October 1, 2018 and October 1, 2019 valuation dates.

### October 1, 2018 valuation date

| Comparable | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Location | 36 Stonebridge Road Montclair, NJ | 32 Llewellyn Road Montclair, NJ | 57 Undercliff Road Montclair, NJ | 61 Wayside Place Montclair, NJ |
| Sale date | 12/1/2017 | 1/19/2018 | 5/16/2018 | 10/24/2017 |
| Sale price | $2,405,950 | $2,400,000 | $2,070,000 | $2,550,000 |
| Price psf | $342.24 psf | $291.97 psf | $329.56 psf | $381.11 psf |
| G.L.A. | 7,030 sq. ft. | 6,220 sq. ft. | 6,281 sq. ft. | 6,691 sq. ft. |
| Lot size | 2.62 acres | 2.28 acres | 1.17 acres | 1.46 acres |
| Bathrooms | 4 full – 2 half | 4 full – 1 half | 6 full – 1 half | 5 full – 1 half |
| Garage | 3 car | 2 car | 3 car | 2 car |
| Basement | Partially finished | Unfinished | Partially finished | Partially finished |
| Amenities | In-ground pool/ pool house/tennis court | None | In-ground pool/ carriage house/ tennis court | In-ground pool/ bocce court |

### October 1, 2019 valuation date

| Comparable | #1 | #2 | #3 | #4 |
|---|---|---|---|---|
| Location | 209 S. Mountain Ave. Montclair, NJ | 85 Upper Mountain Ave. Montclair, NJ | 147 S. Mountain Ave. Montclair, NJ | 105 Union Street Montclair, NJ |
| Sale date | 8/14/2019 | 9/16/2019 | 10/29/2018 | 10/24/2019 |
| Sale price | $2,100,000 | $2,175,000 | $1,615,000 | $1,699,999 |
| Price psf | $311.57 psf | $332.56 psf | $264.15 psf | $262.18 psf |
| G.L.A. | 6,740 sq. ft. | 6,540 sq. ft. | 6,114 sq. ft. | 6,484 sq. ft. |
| Lot size | 0.83 acres | 0.94 acres | 0.54 acres | 0.45 acres |
| Garage | 3 car | 1 car | 4 car | 3 car |
| Bathrooms | 5 full – 2 half | 4 full – 1 half | 4 full – 1 half | 4 full – 1 half |
| Basement | Partially finished | Full finished | Unfinished | Unfinished |
| Amenities | In-ground pool/ carriage house | Carriage house | In-ground pool/carriage house | Carriage house |

Montclair's expert applied adjustments to the comparable sales to account for differences in: (i) skyline views, 5%; (ii) lot size, 10% (equaling $3.95 to $5.20 per square foot); (iii) condition, 10%; (iv) full bathrooms, $50,000 per bathroom; (v) half bathrooms, $25,000 per bathroom; (vi) gross living area, $195 per square foot; (vii) basement finish, $25,000; (viii) in-ground pool and






pool house/carriage house, $75,000 per amenity; and (ix) garage, $25.000 per additional garage. Montclair's expert applied gross adjustments ranging from $418,200 to $810,400, and net adjustments ranging from $129,600 to $702,500. After applying adjustments to the eight comparable sales, Montclair's expert's range of adjusted sale prices was: (i) $2,397,700 to $3,075,200, as of the October 1, 2018 valuation date; and (ii) $2,273,099 to $2,652,200, as of the October 1, 2019 valuation date.

After reconciling the adjusted sales prices, Montclair's expert concluded a true or fair market value for the subject property of $2,595,000, as of the October 1, 2018 valuation date, and $2,470,000, as of the October 1, 2019 valuation date.

3.    Court analysis

At the outset, the court highlights that of the fourteen total comparable sales relied on by the experts (for the 2019 and 2020 tax years), twelve of them were the identical sale transactions. Moreover, the court finds that all fourteen comparable sales were timely, comparable to, and competitive in the marketplace with the subject property.

The court's review and analysis further revealed that many of the adjustment amounts applied by the experts are similar. Both experts adopted a 5% skyline view adjustment; plaintiffs' expert applied a fixed lot size adjustment of $4.00 per square foot, and Montclair's expert applied a 10% lot size adjustment (amounting to between $4.00 and $5.00 per square foot); both experts adopted a 10% condition adjustment; both experts adopted a full bathroom adjustment of $50,000 per bathroom; both experts adopted a half bathroom adjustment of $25,000 per bathroom; both experts adopted a basement finish adjustment of $25,000; and both experts adopted an in-ground pool adjustment of $75,000.

However, due to differences in how each expert perceived and applied their adjustments,






the adjusted sale prices of the six overlapping comparable sales were disparate. The following

chart details the differences in adjusted sale prices derived by the experts:

| Property | Plaintiffs' expert | Montclair's expert | Difference in adjusted sale price |
|---|---|---|---|
| 36 Stonebridge Road | $2,097,685 | $2,542,250 | $444,565 |
| 57 Undercliff Road | $2,105,100 | $2,397,700 | $292,600 |
| 209 S. Mountain Ave. | $2,319,750 | $2,468,200 | $148,450 |
| 85 Upper Mountain Ave. | $2,441,000 | $2,652,200 | $211,200 |
| 147 S. Mountain Ave. | $2,003,650 | $2,317,500 | $313,850 |
| 105 Union Place | $2,158,149 | $2,273,099 | $114,950 |

For example, plaintiffs' expert opined that 36 Stonebridge Road had New York skyline

views like the subject property; thus, he applied no upwards adjustment. Conversely, Montclair's

expert opined that 36 Stonebridge Road possessed no New York skyline views; therefore, he

applied a 5% upwards skyline view adjustment, or $120,300. In addition, plaintiffs' expert

concluded that 36 Stonebridge Road contains an in-ground pool, pool cabana, and a tennis court;

thus, he applied a downward adjustment of -$50,000 to account for the subject property's lack of

a tennis court. Conversely, Montclair's expert expressed that although 36 Stonebridge Road

possesses an in-ground pool, pool cabana, and a tennis court, the pool cabana measured only

approximately 120 square feet and was not comparable nor competitive with the subject property's

1,696 square foot pool house, containing a full kitchen, a living room, a solarium, a bedroom, a

laundry room, 2 full bathrooms, 2 fireplaces, and an outdoor portico/bar with a kitchen. Therefore,

Montclair's expert opined that 36 Stonebridge Road's presence of a tennis court and pool cabana

is offset by the subject property's 1,696 square foot pool house. Accordingly, he concluded no

downward adjustment was warranted. Finally, plaintiffs' expert opined that 36 Stonebridge Road

was in a superior condition compared to the subject property; thus, he applied a downwards

condition adjustment of $240,595. Conversely, Montclair's expert opined that 36 Stonebridge

Road was in good condition, the same condition as the subject property. Therefore, he concluded






that no downwards adjustment was warranted.

The most notable differences in the adjustments applied by the experts were with respect to: (i) gross living area adjustments, plaintiffs' expert applied a $150 per square foot adjustment, and Montclair's expert applied a $195 per square foot adjustment; (ii) Montclair's expert adopted a pool house/carriage house, and tennis court adjustment of $75,000, per amenity, while plaintiffs' expert adopted a tennis court adjustment of $50,000;[10] and (iii) garage size adjustment, Montclair's expert applied a $25,000 per garage adjustment, while plaintiffs' expert made no garage size adjustment.

Accordingly, the court's decision in these matters turns on issues of credibility. Specifically, the court's review of the experts' analysis of the data supporting their adjustments, as well as the underlying factual data about each comparable sale. Additionally, the court's decision will focus on the quality or reasonableness of the adjustments applied. Although the experts may have agreed on certain adjustment percentages or amounts, the basis for how and when those adjustments were applied is pivotal to the court's determination of true or fair market value.

In undertaking a sales comparison approach, a substantial similarity must exist between the subject property and the comparable properties. "Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties." Venino v. Borough of Carlstadt, 1 N.J. Tax 172, 175 (Tax 1980), aff'd o.b. 4 N.J. Tax 528 (App. Div. 1981). However, by definition, comparability does not require properties to be identical, "differences between a comparable property and the subject property are anticipated. They are dealt with by

---

[10] Plaintiffs' expert did not apply any adjustment for a pool house or carriage house, as he concluded that all comparable sales possessed either a pool house or a carriage house.






adjustments recognizing and explaining these differences, and then relating the two properties to each other in a meaningful way so that an estimate of the value of one can be determined from the value of the other." U.S. Life Realty Corp. v. Jackson Twp., 9 N.J. Tax 66, 72 (Tax 1987). Thus, a fundamental predicate of the comparable sales approach requires that the evidence "be based on 'sound theory and objective data', rather than on mere wishful thinking." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (quoting FMC Corp. v. Unmack, 92 N.Y.2d 179, 188 (1998)).

After researching the marketplace and collecting data, an appraiser must carefully scrutinize the data by focusing on the "similarities and differences that affect value . . . which may include variations in property rights, financing, terms, market conditions and physical characteristics." The Appraisal of Real Estate at 378. The appraiser must establish appropriate "elements of comparison for a given appraisal through market research and support those conclusions with market evidence." Id. at 390. Adjustments "must have a foundation obtained from the market" and not be based merely on subjective observations and/or personal experience. Greenblatt, 26 N.J. Tax at 55. Hence, the probative value of the comparable analysis hinges upon the similarities which can be drawn, and the objective market data utilized to support adjustments thereto.

a. Gross living area adjustment

To calculate their gross living area adjustment factors, both plaintiffs' expert and Montclair's expert performed paired sale analyses. A paired sale or paired data analysis is a "qualitative technique used to identify and measure adjustments to the sale price . . . to apply this technique, sales . . . data on nearly identical properties is analyzed to isolate and estimate a single characteristic's effect on value. . . ." Dictionary of Real Estate Appraisal, at 142. Thus, the reliability of a paired sale or paired data analysis is predicated on "the premise that when two






properties are equivalent in all respects but one, the value of the single difference can be measured by the difference in price between the two properties." The Appraisal of Real Estate, at 398.

Plaintiffs' expert utilized two of the comparable sales to conduct his analysis: 36 Stonebridge Road and 147 South Mountain Avenue. However, effective cross-examination disclosed that numerous material differences exist between the two properties in addition to gross living area, including lot size, condition, number of bathrooms, basement finish, and property amenities. Thus, before isolating and attempting to extrapolate the gross living area value difference, plaintiffs' expert applied downward adjustments of $677,094 to 36 Stonebridge Road's sale price. Moreover, during cross-examination, plaintiffs' expert admitted that his gross living area paired sale analysis was "not an ideal situation," due to the numerous adjustments required.

The court does not find the two properties employed by plaintiffs' expert in conducting his paired sale analysis to be identical in all areas except for gross living area. Rather, the court concludes that material disparities exist between the two properties causing plaintiffs' expert to apply downward adjustments of $677,094, leading to considerable doubt regarding the accuracy and credibility of the result.

Conversely, Montclair's expert analyzed sales of two single-family homes in Montclair. Both homes were constructed in the early 1900s, were in similar condition, were offered for sale on a multiple listing service, sold in 2018 within days of each other, possessed similar lot sizes, and had an identical number of bathrooms. The only difference between the two properties seemingly was in their gross living area. Montclair's expert concluded that the disparity between the sale prices of the two homes resulted from their approximately 722 square foot difference in gross living area. Accordingly, Montclair's expert concluded that a $195 per square foot gross living area adjustment was reasonable to account for the size differences between the two






properties. The court finds Montclair's expert's gross living area paired sale analysis to be credible and reliable. Accordingly, the court accepts Montclair's expert's gross living area adjustment of $195 per square foot.

        b.     Bathroom adjustment

As stated above, both experts opined that an adjustment of $50,000, per full bathroom, and $25,000, per half bathroom, was reasonable and supported by their analysis of the market. The court finds the experts' testimony credible on this issue and concludes that the adjustment amounts are reasonable. However, plaintiffs' expert and Montclair's expert disagreed on the number of bathrooms that exist in several of the comparable sales, resulting in diverging bathroom adjustments.

Plaintiffs' expert opined that, based on his review of the property record card and multiple listing, 36 Stonebridge Road contains 5 full bathrooms and 1 half bathroom thus, he applied an upwards bathroom adjustment of $125,000. Conversely, Montclair's expert concluded, based on his review of floorplans prepared by the listing broker, and attached to the multiple listing, that 36 Stonebridge Road contains 4 full bathrooms and 2 half bathrooms, therefore he applied an upwards bathroom adjustment of $150,000.[11] However, during Montclair's expert's communications with the listing broker, they could not recollect the number of bathrooms that exist on the property, instead referring Montclair's expert to the floor plans that they prepared.

Similarly, plaintiffs' expert opined that based on his review of the property record card and

---

[11] Montclair's expert acknowledged that 36 Stonebridge Road's property record card reflects 5 full bathrooms and 1 half bathroom. However, the property record card states, "Info By: Owner," indicating that the revaluation company did not perform an interior inspection of the property. Thus, Montclair's expert questioned the accuracy of the property record card and instead, accepted the information reported on the listing broker's floorplans.



multiple listing, 57 Undercliff Road contains 7 full bathrooms and 3 half bathrooms thus, he applied a downwards half bathroom adjustment of $25,000. Conversely, Montclair's expert concluded that 57 Undercliff Road contains 6 full bathrooms and 1 half bathrooms, therefore he applied an upwards bathroom adjustment of $75,000.

Plaintiffs' expert opined that based on his review of the property record card and multiple listing, 85 Upper Mountain Avenue contains 4 full bathrooms and 2 half bathrooms thus, he applied an upwards bathroom adjustment of $150,000. Conversely, Montclair's expert concluded that 85 Upper Mountain Avenue contains 6 full bathrooms and 1 half bathroom, therefore he applied an upwards bathroom adjustment of $75,000.

Finally, plaintiffs' expert opined that based on his review of the property record card and multiple listing, 209 South Mountain Avenue contains 5 full bathrooms and 3 half bathrooms thus, he applied an upwards bathroom adjustment of $75,000. Conversely, Montclair's expert concluded that 209 South Mountain Avenue contains 5 full bathrooms and 2 half bathrooms, therefore he applied an upwards bathroom adjustment of $100,000.

Based on the court's review and analysis of the property record cards (annexed to plaintiffs' expert's report), and the multiple listings reports contained in both plaintiffs' expert's report and Montclair's expert's report, the court finds that the number of bathrooms reflected on the property record cards for 36 Stonebridge Road, 57 Undercliff Road, 85 Upper Mountain Avenue, and 209 South Mountain Avenue mirrors the multiple listings for each of the properties. Accordingly, the court accepts the number of bathrooms reported by plaintiffs' expert with respect to the above-referenced properties. Consequently, the court accepts plaintiffs' expert's bathroom adjustments for 36 Stonebridge Road, 57 Undercliff Road, 85 Upper Mountain Avenue, and 209 South Mountain Avenue.






c.    Condition adjustment

In plaintiffs' expert's opinion, the subject property is a "nice home, it is not an ultra-high-end house that you could find in this area, certainly average, maybe above average, maybe even good, but it's not very high-end." Based on his review of the multiple listing photographs of 36 Stonebridge Road, plaintiffs' expert expressed that it possessed "higher end kitchen and baths." Accordingly, he applied a downward $240,595 adjustment to 36 Stonebridge Road for its perceived "superior" condition. Plaintiffs' expert offered no further details or testimony distinguishing the subject property's kitchen and bathroom features or condition from 36 Stonebridge Road's kitchen and bathroom features and condition. Moreover, plaintiffs' expert did not furnish the court with copies of the photographs that he reviewed in concluding that its condition is "superior."

Conversely, in Montclair's expert's opinion, the subject property "is not your typical residence, this is an estate-type property, an elaborate residence, it's somewhat unique as far as the style and what it offers." In his opinion, 36 Stonebridge Road is located "in an enclave of similar estate style houses, [however,] they do not offer any type of New York City views." Montclair's expert explained that, like the subject property, 36 Stonebridge Road is also listed on the National Registry of Historic Places and is a "very comparable home" to the subject property. According to Montclair's expert, although the multiple listing states that the property was being "sold 'as is'," based on his discussions with the listing, the property was in "average overall condition."

The court does not find from the sparse evidence presented that plaintiffs' expert has demonstrated that 36 Stonebridge Road is in a "superior" condition to the subject property, thereby warranting a $240,595 downward condition adjustment.






Based on his review of the multiple listing photographs of 147 South Mountain Avenue, Montclair's expert explained that it possessed "wall-to-wall carpeting, [and] was older on the second and third floors." Moreover, Montclair's expert testified that 147 South Mountain Avenue had a "dated kitchen" and based on his review of the interior photographs, the quality of the bathrooms and improvements were "generally inferior to the subject as far as overall condition." Accordingly, he applied an upwards $161,500 adjustment to 147 South Mountain Avenue for its "inferior" condition.

Conversely, in plaintiffs' expert's opinion based on his review of the multiple listing photographs, 147 South Mountain Avenue was in similar condition to the subject property.

Although marginal, the court accepts Montclair's expert's opinion that 147 South Mountain Avenue is in an "inferior" condition to the subject property, thereby warranting a $161,500 upwards condition adjustment.

d.   Skyline view adjustment

As stated above, whether the subject property possesses unobstructed views of the New York skyline, obstructed views of the New York skyline, or partially unobstructed and partially obstructed views of the New York skyline was highly disputed during trial. According to plaintiffs' expert, based on his discussions with the plaintiffs, as of the valuation dates at issue, the subject property's views were obstructed by three dawn redwood trees maintained by Montclair Township located in the front apron of the property along Lloyd Road. The trees were apparently removed by Montclair after the valuation dates involved herein, however, prior to plaintiffs' expert's inspection of the subject property.

In plaintiffs' expert's opinion, the subject property, "hardly [had] views of the city, . . . there were dawn redwood trees at the street that were owned by the town . . . these are evergreen


Interpreter


ADA
Americans with
Disabilities Act


ENSURING
AN OPEN DOOR TO
JUSTICE



trees that grow up to 120 feet tall and obstructed the view of the city except for . . . parts of the second floor and parts of the pool house had views, but the actual house, . . . the sunrooms, you didn't see the city, up until I guess, 2021. . . ." Further questioning of plaintiffs' expert disclosed that "[w]here the bedrooms are had partial views, they were obstructed by the tops of the trees, . . . but when you get over to the pool house, . . . the trees did not extend all the way down the street to the pool house, so when you are sitting . . . over by the diving board there were never trees over there, . . . you had views." Accordingly, plaintiffs' expert considered the subject property to have no views of the New York City skyline and applied downward adjustments of 5% to his comparable sales that had New York City skyline views.

In Montclair's expert's opinion the previously existing dawn redwood "trees . . . frame the subject property's views." Stated differently, Montclair's expert explained that in examining "the historical view of the subject property from the front, it's framed by the two mature trees, . . . [however,] the front still offers unobstructed views of the New York skyline." According to Montclair's expert, 85 Upper Mountain Avenue has the "same views that the subject property has, they've got a tree in the middle and two larger trees on either side . . . that frame the view that they have. If anything, this probably has an inferior view than the subject property." Montclair's expert further explained that he applied an adjustment equal to 5% of the sale price of each comparable sale for the New York City skyline view as being "appropriate." In his opinion, "there's no way that we can extract a paired sales analysis to come up with an adjustment for a New York City view, not in Montclair anyway, not with these various types of homes there are."

During trial, plaintiffs' expert and Montclair's expert identified numerous Google Maps photographs of the subject property from August 2019 and October 2020, depicting differing viewpoints of the subject property, Lloyd Road, and the three dawn redwood trees. The






photographs depict three evergreen trees, approximately 40-45 feet in height and approximately 20 to 30 feet wide. Two trees frame each side of the subject property's paver driveway, and the third tree is located approximately forty-five feet to the east of the subject property's driveway. Based on the testimony elicited during trial, and a review of the photographs, the court finds Montclair's expert's testimony more credible on this issue, concluding that the trees only partially obstructed the subject property's views of the New York City skyline. Although no photographs of the subject property's skyline views, as of the tax years at issue, were presented during trial the court finds that the trees were spaced apart and only partially obstructed the subject property's views. Depending on where an individual was situated in the main residence or along its grounds, certain areas seemingly offered unimpeded skyline views, framed by the dawn redwood trees, while others offered skyline views that were either fully or partially impacted by the trees. The subject property's lot has a width of approximately 266 feet; thus, given the size and spacing of the trees, the court finds that they impacted only a portion of the overall skyline views. Moreover, the court observes that both the easternmost and westernmost boundaries of the subject property were not impeded by any trees; thus, the pool house (on the western boundary) had unencumbered views of the New York skyline, and looking out from the subject home, along the easternmost boundary, offered unobstructed views.

In sum, the court concludes that the subject property possessed partially unobstructed and partially obstructed New York skyline views. Thus, the court rejects plaintiffs' experts downward view adjustments to 57 Undercliff Road and 85 Upper Mountain Avenue, that plaintiffs' expert deemed superior for possessing New York skyline views. Moreover, the court accepts Montclair's expert's upward view adjustments to 36 Stonebridge Road, 32 Llewellyn Road, 61 Wayside Place, 209 South Mountain Avenue, 147 South Mountain Avenue, and 105 Union Street. In addition,






the court accepts Montclair's expert's opinion that no view adjustment is warranted to 85 Upper Mountain Avenue and 57 Undercliff Road.

e.    Lot Size

As stated above, the lot size adjustments applied by both plaintiffs' expert and Montclair's expert were very similar.  Plaintiffs' expert applied a $4.00 per square foot adjustment, while Montclair's expert applied a 10% adjustment (equaling $3.95 to $5.20 per square foot).  Plaintiffs' expert offered that he conducted a paired sales analysis of 36 Stonebridge Road and 147 South Mountain Avenue to discern his lot size adjustment.  Montclair's expert offered that he discerned his lot size adjustment based on his discussions with several real estate agents in the area, who indicated that the range is $3.00 to $5.00 per square foot.

Based on the evidence presented, the court concludes that a lot size adjustment of $4.00 per square is reasonable and supported by the market data.  Accordingly, the court accepts plaintiffs' expert's downward lot size adjustment to 36 Stonebridge Road (-$243,920) and will apply a $4.00 per square foot downward lot size adjustment to 32 Llewellyn Road (-$184,700).

f.    Amenities

As stated above, both plaintiffs' expert and Montclair's expert each applied an upwards $75,000 adjustment to account for the subject property's in-ground infinity pool.  Plaintiffs' expert did not apply any adjustments to his comparable sales for the subject property's pool house, opining that each of his comparable sales possessed either a pool house or carriage house; thus, no adjustment was warranted.  Montclair's expert only applied an upwards $75,000 adjustment to 32 Llewellyn Road to account for its lack of a pool house or carriage house.

In attempting to calculate the value of his elevator adjustment, plaintiffs' expert "utilized Marshall & Swift to help me determine that cost . . . Marshall & Swift gives a cost for an elevator."






According to plaintiffs' expert, Marshall & Swift cost estimates the cost of an elevator is approximately "$95,000, but in there it says for small residential elevators decrease the cost by 60% . . . you get to $37,500 rounded, then we then applied the local and current multipliers comes $48,835, which I rounded to $50,000." Conversely, according to Montclair's expert, Marshall & Swift is a "cost service that appraisers use to . . . value properties that are fairly new or special-purpose, or limited-market properties . . . that are not sold with frequency, it's not applicable in the valuation of a house that is built in 1916." In his opinion, "cost is not synonymous with value, we are talking about a market approach, a comparative approach, nobody looks at Marshall & Swift to determine what an adjustment should be, it's not consulted with by any purchasers that I am aware of, I don't know why I'd consult it to figure out what an adjustment should be, I don't think anybody should. . . ." Moreover, in addressing how plaintiffs' expert utilized Marshall & Swift, Montclair's expert expressed that "to utilize it to extract . . . support for his adjustments, . . . you have to actually know what that component is . . . did he [plaintiffs' expert] depreciate the elevator, was he [plaintiffs' expert] in it, does he [plaintiffs' expert] know . . . what condition the elevator was in. . . ." In sum, in Montclair's expert's opinion, "we are doing a comparative or market data approach, and you go to the market and try and find out what's the market going to pay, what that contributory value of those amenities will be, if you can extract an adjustment out of it, it's a market extracted adjustment. I don't know a single purchaser that would even know what Marshall & Swift is, unless they are appraisers." Thus, Montclair's expert engaged in discussions with real estate professionals and market participants to attempt to glean the value that the marketplace would ascribe to the amenities, including the residential elevator.

Finally, in plaintiffs' expert's opinion, "I didn't give [any] value to the sport court [basketball court], . . . it wasn't in very good shape, it was kind of in the very back of the property,

   

I found no value to it." Additionally, despite the subject property containing a koi pond, plaintiffs' expert did not attribute any value to that amenity on the subject property.

The court observes that cost manuals and cost service computer programs may accurately generate the estimated replacement cost for an improvement; however, the potential cost outlays associated with an improvement do not necessarily equate to value in the marketplace. Although plaintiffs' expert may have calculated the estimated replacement cost of a residential elevator, he did not perform a market analysis or confer with market participants to confirm that the subject property's marketplace will ascribe the same or a similar value to it. Moreover, as highlighted by Montclair's expert, depending on the age and condition of the elevator, a depreciation factor must be applied to discern an accurate replacement cost value. Here, plaintiffs' expert did not personally inspect the elevator and offered no testimony or evidence as to the age or condition of the elevator, and what depreciation factor, if any, should be applied to discerning its value.

In Montclair's expert's opinion, based on his review of the identified comparable sale properties and his discussions with real estate agents engaged in the subject property's marketplace, the adjustments for amenities like an in-ground pool and pool house will "vary based on the quality and location of the property." In his opinion, the subject property has "substantial additional amenities such as the pool house, the infinity pool, the spa, the koi pond, the sports court, all these features and also, . . . the elaborate outdoor kitchen and pavilion there with the gas barbecues, . . . . we asked realtors, we asked people that were active in the market, what these features would command or what would they contribute to the sale of a property. . . ." Moreover, according to Montclair's expert, based on his discussions with market participants, he could not discern a distinct value for a residential elevator in the marketplace.

The court finds Montclair's expert's amenity adjustments more credible and representative






of the marketplace. Moreover, the court finds Montclair's expert's analysis of the quality and condition of the amenities attributable to each comparable sale more reliable. Specifically, the court finds Montclair's expert's testimony with respect to the offsetting amenities adjustments to 36 Stonebridge Road, 57 Undercliff Road, and 147 South Mountain Avenue to be more credible. Accordingly, the court will apply the following amenity adjustments to the comparable sales: (i) 36 Stonebridge Road, $0.00; (ii) 32 Llewellyn Road, $150,000 (in-ground pool and pool house); (iii) 57 Undercliff Road, $0.00; (iv) 61 Wayside Place, $75,000 (in-ground pool); (v) 147 South Mountain Avenue, $0.00; (vi) 209 South Mountain Avenue, $0.00; (vii) 85 Upper Mountain Avenue, $75,000 (in-ground pool); and (viii) 105 Union Street, $75,000 (in-ground pool).

        g.    Reconciliation/Conclusion of true market value

"The trial judge as the factfinder is not bound by the opinion valuation of the experts on either side. Just as a jury, a judge may adopt 'so much of it as appears sound, reject all of it, or adopt all of it.'" Riorano, Inc. v. Weymouth Twp., 4 N.J. Tax 550, 564 (Tax 1982) (quoting State Highway Com. v. Dover, 109 N.J.L. 303, 307 (E. & A. 1932)).

For the reasons detailed above, the following charts reconcile the adjustments offered by the experts, accepted by the court, and applied to each comparable sale found by the court to be credible evidence of true market value as of the October 1, 2018, and October 1, 2019 valuation dates.






October 1, 2018

| Location | 36 Stonebridge Road Montclair, NJ | 32 Llewellyn Road Montclair, NJ | 57 Undercliff Road Montclair, NJ | 61 Wayside Place Montclair, NJ | 147 South Mountain Ave. Montclair, NJ |
|---|---|---|---|---|---|
| Sale price | $2,405,950 | $2,400,000 | $2,070,000 | $2,550,000 | $1,615,000 |
| View Adj. | $ 120,300 | $ 120,000 | $ 0 | $ 127,500 | $ 80,800 |
| Lot Size Adj. | $ -243,920 | $ -184,700 | $ 0 | $ 0 | $ 0 |
| G.L.A. Adj. | $ 131,600 | $ -100,400 | $ 277,700 | $ 197,700 | $ 310,200 |
| Condition | $ 0 | $ 0 | $ 0 | $ 0 | $ 161,500 |
| Bathroom Adj. | $ 125,000 | $ 175,000 | $ -25,000 | $ 125,000 | $ 175,000 |
| Garage Adj. | $ -25,000 | $ 0 | $ -25,000 | $ 0 | $ -50,000 |
| Basement Adj. | $ 0 | $ 25,000 | $ 0 | $ 0 | $ 25,000 |
| Amenities Adj. | $ 0 | $ 150,000 | $ -50,000 | $ 75,000 | $ 0 |
| **Adj. Sale Price** | **$2,513,930** | **$2,584,900** | **$2,247,700** | **$3,075,200** | **$2,317,500** |

According equal weight to each of the five above-referenced comparable sales, the court concludes the subject property's true market value, as of the October 1, 2018, valuation date is $2,550,000.

October 1, 2019

| Location | 209 S. Mountain Ave. Montclair, NJ | 85 Upper Mountain Ave. Montclair, NJ | 147 South Mountain Ave. Montclair, NJ | 105 Union Street Montclair, NJ |
|---|---|---|---|---|
| Sale price | $2,100,000 | $2,175,000 | $1,615,000 | $1,699,999 |
| View Adj. | $ 105,000 | $ 0 | $ 80,800 | $ 85,000 |
| Lot Size Adj. | $ 0 | $ 0 | $ 0 | $ 0 |
| G.L.A. Adj. | $ 188,200 | $ 227,200 | $ 310,200 | $ 238,100 |
| Condition | $ 0 | $ 0 | $ 161,500 | $ 0 |
| Bathroom Adj. | $ 75,000 | $ 150,000 | $ 175,000 | $ 175,000 |
| Garage Adj. | $ -25,000 | $ 25,000 | $ -50,000 | $ -25,000 |
| Basement Adj. | $ 0 | $ -25,000 | $ 25,000 | $ 25,000 |
| Amenities Adj. | $ 0 | $ 75,000 | $ 0 | $ 75,000 |
| **Adj. Sale Price** | **$2,443,200** | **$2,627,200** | **$2,317,500** | **$2,273,099** |

According equal weight to each of the four above-referenced comparable sales, the court






concludes the subject property's true market value, as of the October 1, 2019 valuation date, is $2,420,000.

### h. Application of Chapter 123 Ratio

Having reached a conclusion of the true market value of the subject property, the court will turn its attention to a determination of the correct assessment for the 2019 and 2020 tax years.

Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property. . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). Expressed as a formula, tax assessment/true value = ratio.

For the 2019 tax year, the ratio of assessed value, $2,325,600, to true value, $2,550,000, yields a ratio of 91.2% ($2,325,600/$2,550,000 = 91.2%), which falls between the upper limit (100%) and the lower limit (76.70%) of the Chapter 123 common level range. Consequently, no reduction to the subject property's 2019 tax year assessment is warranted.

For the 2020 tax year, the ratio of assessed value, $2,325,600, to true value, $2,420,000, yields a ratio of 96% ($2,325,600/$2,420,000 = 96%), which falls between the upper limit (100%) and the lower limit (76.70%) of the Chapter 123 common level range. Consequently, no reduction to the subject property's 2020 tax year assessment is warranted.






Accordingly, judgments affirming the subject property's 2019 and 2020 local property tax

assessments shall be entered.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




