**TAX COURT OF NEW JERSEY**



**JOSHUA D. NOVIN**
**Judge**

Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

**NOT FOR PUBLICATION WITHOUT THE APPROVAL**
**OF THE TAX COURT COMMITTEE ON OPINIONS**

April 26, 2023

Robert D. Blau, Esq.
Blau & Blau
223 Mountain Avenue
Springfield, New Jersey 07081

Fred Semrau, Esq.
Robert J. Rossmeissl, Esq.
Dorsey & Semrau
714 Main Street
P.O. Box 228
Boonton, New Jersey 07005

> Re: City of Newark and City of Newark-Div. Sewer and Water
> <u>v. West Milford Township</u>
> Docket Nos. 015734-2014, 006894-2015, 005070-2016, 007402-2018,
> 005841-2018, 006935-2019, 008282-2019, 008756-2020, 011966-2020,
> 003283-2021, and 003338-2021

Dear Mr. Blau, Mr. Semrau, and Mr. Rossmeissl:

This shall constitute the court's opinion on West Milford Township's motions for summary judgment seeking to strike the City of Newark's proposed valuation expert's appraisal report and bar his testimony arising therefrom, as a net opinion, and dismissing the City of Newark's complaints.[1]

In sum, West Milford Township contends that the City of Newark's proposed valuation expert's highest and best use analysis is fatally flawed because he failed to offer "any support or justification for a valid highest and best use." West Milford Township maintains that the appraisal

---

[1] In its sur-reply brief, West Milford Township asked the court to conduct a N.J.R.E. 104 hearing on the admissibility of the City of Newark's proposed valuation expert's appraisal report.

report "sets forth a net opinion of the appraiser that is not based upon any highest and best use but is instead based upon an 'alternate' highest and best use that the report itself acknowledges is not legally permissible."

For the reasons explained more fully below, West Milford Township's motions are denied.

## I.    Procedural History and Findings of Fact

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the certifications and exhibits offered in support of, and in opposition to the summary judgment motions.

The City of Newark ("Newark") is the owner of 121 lots ("the subject property"), comprising approximately 16,458 acres of wooded real property in West Milford Township ("West Milford"), Passaic County, New Jersey. The subject property constitutes part of Newark's watershed and is maintained as a buffer for the protection of Newark's water supply.[2] The subject property includes Echo Lake, Clinton Reservoir, and portions of Canistear Reservoir.

For the 2014 through 2021 tax years, the subject property's lots bore an aggregate assessed value ranging from $17,144,200 to $44,060,200.[3] Newark timely filed appeals contesting the subject property's 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax year assessments. West Milford timely filed counterclaims for the 2014, 2015, 2016, 2018, 2019, 2020, and 2021 tax years, arguing that the subject property's tax assessments are less than its true or market value. In addition, for the 2018 and 2019 tax years, West Milford timely filed complaints similarly arguing that the tax assessments on one hundred seventeen (117) of the subject property's lots are less than

---

[2]  Approximately 35,000 acres of land in New Jersey comprise Newark's watershed area.
[3]  Newark's brief asserts that the total assessed values are $44,069,200.

   

their true or market value, and that West Milford is discriminated against by their assessed value.

On May 2, 2021, the court entered a Case Management Order scheduling the mutual exchange of appraisal reports for September 27, 2021, and scheduling trial commencing on November 15, 2021. Over the following fifteen (15) months, the parties sought, and received, adjournments of the appraisal exchange dates and trial dates because of difficulties experienced in completing their appraisal reports.

By Clerk's Notice dated August 9, 2022, the court adjourned the mutual exchange of expert reports to October 3, 2022 and scheduled a peremptory trial date in these matters commencing January 12, 2023.

By letter dated October 27, 2022, Newark advised the court that on October 24, 2022, "the parties exchanged their expert reports."

By letter dated November 8, 2022, Newark requested the court conduct the January 12, 2023 peremptory trial virtually and set forth reasons supporting its request. Accordingly, under Clerk's Notice dated November 9, 2022, the court requested West Milford to advise in writing by November 14, 2022 whether it consented or objected to Newark's request to conduct the peremptory trial virtually in these matters.

By letter dated November 14, 2022, West Milford submitted another adjournment request of the trial in these matters. West Milford stated that, "4 pre-trial depositions are likely to take place" and that following such depositions "we aim to begin negotiating stipulations of fact."

Accordingly, on November 22, 2022, the court conducted a telephone conference call with counsel for West Milford and counsel for Newark. The court proposed to counsel that if all depositions will be completed within sixty (60) days of the conference, or on or about January 27,






2023, the court would adjourn the January 12, 2023 peremptory trial date. Counsel agreed with the court that such time frame for conducting depositions was reasonable and the court adjourned the January 12, 2023 peremptory trial date to March 20, 2023.[4]

On February 9, 2023, West Milford took the deposition of Newark's proposed valuation expert.

On February 17, 2023, West Milford filed the instant motions for summary judgment, under R. 4:46-1, returnable Friday, March 17, 2023.[5]

On February 22, 2023, the court conducted a telephone conference call on the record with counsel for West Milford and counsel for Newark. The court sought to afford Newark the opportunity to first address West Milford's arguments that "good cause" exists under R. 4:46-1 for consideration of West Milford's untimely summary judgment motions, before having to address the substance of the West Milford's motions. Newark's counsel did not contest that good cause may exist under R. 4:46-1 for consideration of West Milford's untimely summary judgment motions. However, Newark maintained that given the proximity of the summary judgment motions' March 17, 2023 return date to the March 20, 2023 trial date, potential prejudice and due process considerations would require adjournment of the March 20, 2023 trial.

Accordingly, on February 23, 2023, the court issued a letter opinion finding that good cause exists, under R. 4:46-1, for consideration of West Milford's untimely summary judgment motions in the above matters. However, because of the potential prejudice to Newark, the court adjourned the March 20, 2023 peremptory trial date in these matters.

---

[4] However, due to reasons outside of his control, Newark's counsel was unavailable during a time period in January, resulting in the adjournment of Newark's proposed expert's deposition.
[5] The return date for the motions was subsequently adjourned twice at the request of counsel.






On March 8, 2023, Newark took the deposition of West Milford's proposed valuation expert.

## II. Conclusions of Law

### A. Highest and best use

Determination of the subject property's highest and best use on the relevant valuation dates is pivotal in discerning its true or fair market value. Therefore, the court considers West Milford's summary judgment motions against the backdrop of settled law regarding the highest and best use analysis.

In Clemente v. Twp. of South Hackensack, 27 N.J. Tax 255, 267-69 (Tax 2013), aff'd, 28 N.J. Tax 337 (App. Div. 2015), Judge Andresini succinctly explained the legal precedent that guides this court in making a highest and best use determination:

> For property tax assessment purposes, property must be valued at its highest and best use. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 300-01 (1992). "Any parcel of land should be examined for all possible uses and that use which will yield the highest return should be selected." Inmar Associates, Inc. v. Township of Edison, 2 N.J. Tax 59, 64 (Tax 1980). Accordingly, the first step in the valuation process is the determination of the highest and best use for the subject property. American Cyanamid Co. v. Township of Wayne, 17 N.J. Tax 542, 550 (Tax 1998), aff'd, 19 N.J. Tax 46 (App. Div. 2000). "The concept of highest and best use is not only fundamental to valuation but is a crucial determination of market value. This is why it is the first and most important step in the valuation process." Ford Motor Co. v. Township of Edison, 10 N.J. Tax 153, 161 (Tax 1988), aff'd o.b. per curiam, 12 N.J. Tax 244 (App. Div. 1990), aff'd, 127 N.J. 290 (1992); see also Gen. Motors Corp. v. City of Linden, 22 N.J. Tax 95, 107 (Tax 2005).
>
> The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal. Highest and best use is defined as:






> The reasonably probable and legal use of vacant land or improved property that is physically possible, appropriately supported, and financially feasible and that results in the highest value.
>
> [Appraisal Institute, The Appraisal of Real Estate, 22 (13th ed. 2008).]

The highest and best use analysis requires sequential consideration of the following four criteria, determining whether the use of the subject property is: 1) legally permissible; 2) physically possible; 3) financially feasible; and 4) maximally productive. Ford Motor Co., supra, 10 N.J. Tax at 161; see also The Appraisal of Real Estate at 279. Implicit in this analysis is the assumption that the proposed use is market-driven; in other words, that it is determined in a value-in-exchange context and that there is a market for such use. WCI-Westinghouse v. Township of Edison, 7 N.J. Tax 610, 616-17 (Tax 1985), aff'd o.b. per curiam, 9 N.J. Tax 86 (App. Div. 1986). A highest and best use determination is not based on value-in-use because the determination is a function of property use and not a function of a particular owner's use of subjective judgment as to how a property should be used. See Entenmann's Inc. v. Borough of Totowa, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use of an improved property is the "use that maximizes an investment property's value, consistent with the rate of return and associated risk." Ford Motor Co., supra, 127 N.J. at 301. Further, the "actual use is a strong consideration" in the analysis. Ford Motor Co., supra, 10 N.J. Tax at 167.

Highest and best use is not determined through subjective analysis by the property owner. The Appraisal of Real Estate at 279. The proper highest and best use requires a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses. See Cherry Hill, Inc. v. Township of Cherry Hill, 7 N.J. Tax 120, 131 (Tax 1984), aff'd, 8 N.J. Tax 334 (App. Div. 1986). Additionally, the proposed use must not be remote, speculative, or conjectural. Id. If a party seeks to demonstrate that a property's highest and best use is other than its current use, it is incumbent upon that party to establish that proposition by a fair preponderance of the evidence. Penn's Grove Gardens, Ltd v. Borough of Penns Grove, 18 N.J. Tax 253, 263 (Tax 1999); Ford Motor Corp., supra, 10 N.J. Tax at 167. Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently. Highview Estates v.






> Borough of Englewood Cliffs, 6 N.J. Tax 194, 200 (Tax 1983).
>
> [Clemente, 27 N.J. Tax at 267-69.]

When undertaking a highest and best use analysis, although the legally permissible and physically possible criteria can be considered in either order, both criteria must be applied before consideration is given to the financially feasible and maximally productive criteria. Our courts have repeatedly emphasized that:

> Tests of legal permissibility and physical possibility must be applied before the remaining tests of financial feasibility and maximal productivity. A use may be financially feasible, but this is irrelevant if it is physically impossible or legally prohibited. Only when there is a reasonable possibility that one of the prior, unacceptable conditions can be changed is it appropriate to proceed with the analysis.
>
> [Mori v. Town of Secaucus, 15 N.J. Tax 607, 619 (Tax 1996), rev'd on other grounds, 17 N.J. Tax 96 (App. Div. 1997) (quoting Appraisal Institute, The Appraisal of Real Estate, 280 (10th ed. 1992)) (emphasis in original).]

See also County of Monmouth v. Hilton, 334 N.J. Super. 582, 588 (App. Div. 2000); Schimpf v. Little Egg Harbor Twp., 14 N.J. Tax 338, 344 (Tax 1994); Appraisal Institute, Appraisal of Real Estate, 335 (14th ed. 2013) (concluding that "[i]n practice, the tests of physical possibility and legal permissibility can be applied in either order, but they must be applied before the tests of financial feasibility and maximum productivity.")

Thus, a highest and best use analysis requires the valuation expert to interpret "the market forces that affect the subject property and identify[] the use or uses on which the final opinion of value is based." Appraisal Institute, The Appraisal of Real Estate, 42 (14th ed. 2013). The valuation expert must closely examine the physical surroundings, zoning ordinances, and legal restrictions applicable to the parcel being appraised, and consider "all possible [permitted] uses






and [select] that use which will yield the highest return. . . ." Inmar Associates, Inc. v. Edison Twp., 2 N.J. Tax 59, 64 (Tax 1980). In sum, the highest and best use is truly an analysis, interpretation, and "economic study of market forces focused on the subject property." Appraisal Institute, The Appraisal of Real Estate, 305 (11th ed. 1996).

     B.    Summary judgment standard

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the [moving] party is entitled to a judgment or order as a matter of law." Alpha I, Inc. v. Dir., Div. of Taxation, 19 N.J. Tax 53, 56 (Tax 2000) (citing R. 4:46-2). R. 4:46-2 outlines the circumstances under which a motion for summary judgment should ordinarily be granted:

> if the pleadings, depositions, answers to interrogatories and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.

> [R. 4:46-2.]

In Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)), our Supreme Court adopted the federal approach to resolving motions for summary judgment, in which "the essence of the inquiry [is] whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." In conducting this inquiry, the trial court must engage in a "kind of weighing that involves a type of evaluation, analysis and sifting of evidential materials." Id. at 536. The standard established by our Supreme Court in Brill is as






follows:

> [W]hen deciding a motion for summary judgment under R. 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential material presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational fact finder to resolve the alleged disputed issue in favor of the non-moving party.
>
> [Brill, 142 N.J. at 536.]

In considering the material evidence before it when gauging if a genuine issue of material fact exists, the court must view most favorably those items presented to it by the party opposing the motion and all doubts are to be resolved against the movant. Ruvolo v. American Gas Co., 39 N.J. 490, 491 (1963). The moving party bears the burden "to exclude any reasonable doubt as to the existence of any genuine issue of material fact" with respect to the claims being asserted. United Advertising Corp. v. Metuchen, 35 N.J. 193, 196 (1961). "By its plain language, R. 4:46-2 dictates that a court should deny a summary judgment motion only where a party opposing the motion has come forward with evidence that creates a 'genuine issue as to any material fact challenged.'" Brill, 142 N.J. at 529. When the party opposing the motion merely presents "facts which are immaterial or of an insubstantial nature, a mere scintilla, fanciful, frivolous, gauzy or merely suspicious," then an otherwise meritorious application for summary judgment should not be defeated. Judson v. Peoples Bank and Trust Co., 17 N.J. 67, 75 (1954). Hence, "when the evidence is so one-sided that one party must prevail as a matter of law . . . the trial court should not hesitate to grant summary judgment." Brill, 142 N.J. at 540 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. at 252).

Accordingly, as framed by the court, the issues presented for disposition under these






summary judgment motions are whether Newark's proposed valuation expert's highest and best use analysis, and the value conclusions that he derived therefrom, are adequately supported by: (i) his review of applicable laws (including but not limited to zoning laws), legal restrictions, and physical conditions impacting and/or affecting the subject property; (ii) a comprehensive analysis of the subject property's current uses and an examination of the market forces driving demand for certain property uses; (iii) consideration of alternate uses for the subject property, including the fiscal viability of both the current uses and any alternate uses; and (iv) the selection of a use that will yield the highest return or maximize the property's value, consistent with its limitations and an appropriate rate of return and risk.

Here, in support of its motions, West Milford argues that Newark's proposed valuation expert "blatantly declines to determine the highest and best use, listing as the highest and best use 'None' and noting simply that the 'subject property does not have a highest and best use.'" Moreover, West Milford contends that Newark's proposed valuation expert has failed to offer "any support or justification for a valid highest and best use. Instead, the appraisal report merely sets forth a net opinion of the appraiser that is not based upon any highest and best use but is instead based upon an 'alternate' highest and best use that the report itself acknowledges is not legally permissible."

West Milford further maintains that Newark's proposed valuation expert dismisses passive recreation and commercial timber harvesting as highest and best uses for the subject property, without adequate investigation, data, or analysis. Then, Newark's proposed valuation expert "conjures up a 'Hypothetical Condition,' that 'the sale of firewood is legally permissible' as a use for the subject property, acknowledging that this is not a legal use, and proceeds to provide a






hypothetical valuation on this basis." However, West Milford emphasizes that this hypothetically legally permissible condition does not exist, because the sale of firewood "outside of the subject property" is expressly prohibited under the terms of the conservation easement.

Thus, West Milford maintains that Newark's proposed valuation expert's highest and best use analysis of the subject property is so fatally flawed that any opinions stemming therefrom are net opinions. Therefore, West Milford asserts that Newark's proposed valuation expert's appraisal report and any testimony arising therefrom must be barred by the court. Accordingly, West Milford argues that, as a matter of law, Newark will be unable to, at trial, meet its burden of overcoming the presumption of validity that attaches to the subject property's local property tax assessments, mandating dismissal of Newark's complaints.

In response, Newark contends that in conducting his highest and best use analysis, Newark's proposed valuation expert adequately considered passive recreation and commercial timber harvesting as highest and best uses for the subject property. Newark argues that after evaluating the conservation easements and restrictions burdening the subject property, Newark's proposed valuation expert concluded that the subject property was already being used for passive recreation purposes. Moreover, after evaluating the income being generated by Newark from the subject property under its current passive recreation use, its proposed valuation expert concluded that passive recreation is not financially feasible. Accordingly, he found that passive recreation was not the subject property's highest and best use.

However, because N.J.S.A. 54:4-23 requires each tax assessor to annually "determine the full and fair value of each parcel of real estate situate in the taxing district at such price, as in his judgment, it would sell for at a fair and bona fide sale by private contract," the market value of






such real property implicitly contemplates that there "is a group of potential buyers and sellers of land." As such, Newark asserts that, in conducting his highest and best use analysis, its proposed valuation expert properly considered whether anyone would purchase the subject property for passive recreational uses. Since "[s]hear logic would dictate that no one would purchase land in order to preserve it as open space[,] if it is already preserved as open space forever," Newark maintains that substantial evidence existed that there was no market for the subject property. Thus, in his opinion, no one would purchase the subject property from Newark for that continued passive recreation use. Accordingly, because no buyer would purchase the subject property from Newark for passive recreation uses, no market exists for the subject property.[6]

Moreover, Newark highlights that its proposed valuation expert considered commercial timbering operations as a highest and best use. However, after reviewing the court's decision in City of Newark v. Jefferson Twp., 31 N.J. Tax 303, 321 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021), where the trial court found that the valuation expert presented no market data demonstrating "a clear demand for timberland in New Jersey," Newark's proposed valuation expert concluded that commercial timbering operations were not a viable highest and best use for the subject property.

Accordingly, Newark maintains that genuine issues of material fact exist with respect to

---

[6] In its opposition, Newark devotes substantial effort to criticizing the alleged opinions and conclusions reached by West Milford's proposed valuation expert. However, the court emphasizes that West Milford's motions are directed only at the perceived inadequacies of Newark's proposed valuation's expert's analysis and conclusions. West Milford does not argue that the court should grant summary judgment based on the strength of the analysis and conclusions reached by West Milford's proposed valuation expert. Accordingly, while Newark may seek to advance those arguments during trial, they are misplaced as evidence that genuine issues of material fact exist in response to West Milford's motions.






the subject property's highest and best use and whether the data and information relied on by its proposed expert demonstrates that a market exists for those uses. Therefore, denial of West Milford's summary judgment motions is warranted.

To resolve the issues before the court, the court has been presented with: (i) the February 9, 2023 deposition transcript of Newark's proposed valuation expert, Jon P. Brody ("Mr. Brody"); (ii) Mr. Brody's appraisal report dated October 23, 2022 (the "Appraisal Report"); (iii) the September 13, 2022 deposition transcript of Kenya Travitt, Newark's watershed recreation facility manager; (iv) the 2018-2022 New Jersey Statewide Comprehensive Outdoor Recreation Plan; (v) the October 18, 2022 report from Pinto Consulting, LLC; and (vi) copies of the conservation easements burdening the subject property.

### C. Expert testimony and net opinion rule

"The admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Berry, 140 N.J. 280, 293 (1995)). N.J.R.E. 702 and N.J.R.E. 703 delineate the path which a trial court must navigate in the admission of expert testimony. The fundamental requirements for admission of expert testimony under N.J.R.E. 702 are:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Creanga v. Jardal, 185 N.J. 345 (2005) (quoting Kemp ex rel. Wright v. State, 174 N.J. 412, 424 (2002)).]

Thus, not only must the testimony be sufficiently reliable and meaningful to the trier of fact, but the witness must also possess the requisite "knowledge, skill, experience, training, or






education" to be qualified as an expert and to offer opinion testimony. N.J.R.E. 702.

However, an expert's opinion must be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts." Polzo v. County of Essex, 196 N.J. 569, 583 (2007) (quoting State v. Townsend, 186 N.J. 473, 494 (2006)). The opinion of an expert must be supported by a proper foundation and based upon credible facts, data, and analysis which are reasonably relied upon by experts in the field. Peer v. City of Newark, 71 N.J. Super. 12, 21 (App. Div. 1961), certif. denied, 36 N.J. 300 (1962). As stated by our Appellate Division,

> In addition to determining whether a witness is qualified to testify as an expert, the trial court must also decide the closely related issue as to whether the expert's opinion is based on facts and data. Biunno, Current N.J. Rules of Evidence, comment 2 on N.J.R.E. 702 (2002). As construed by applicable case law, N.J.R.E. 703 requires that an expert's opinion be based on facts, data, or another expert's opinion, either perceived by or made known to the expert, at or before trial. Buckelew v. Grossbard, 87 N.J. 512, 524 (1981); Nguyen v. Tama, 298 N.J. Super. 41, 48-49 (App. Div. 1997).
>
> [Rosenberg v. Tavorath, 352 N.J. Super. 385, 401 (App. Div. 2002).]

Therefore, after qualifying a witness as an expert, it is incumbent upon the trial court to evaluate the facts or data which form the basis of the expert's opinion. The rule mandates experts "identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). Thus, an expert is required to "give the why and wherefore of his or her opinion, rather than a mere conclusion." Jimenez v. GNOC, Corp., 286 N.J. Super. 533, 540 (App. Div.), certif. denied, 145 N.J. 374 (1996).






Conclusions of an expert that are unsupported by facts, data, statistics, surveys, studies, or analysis will not withstand judicial scrutiny and constitute an inadmissible net opinion. See State v. Townsend, 186 N.J. at 494-495. As such, the net opinion rule is a "corollary of [N.J.R.E. 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data. See Polzo, 196 N.J. at 583. Accordingly, the admissibility or inadmissibility of an expert's opinion hinges "upon the facts and reasoning which form the basis of the opinion. Without explanation as to the basis, the opinion of the expert is entitled to little weight. . . ." Dworman v. Borough of Tinton Falls, 1 N.J. Tax 445, 458 (Tax 1980), aff'd, 180 N.J. Super. 366 (App. Div.), certif. denied, 88 N.J. 495 (1981). Thus, striking an expert's report and testimony as a net opinion is an appropriate remedy when it is clear from the evidence presented that the expert failed to rely on facts, data, statistics, and analysis for support of his or her opinion, or failed to demonstrate that the approach or methodology employed is scientifically reliable.

Importantly however, an expert's opinion is not rendered a net opinion simply because it may be subject to attack during cross-examination due to the expert's failure to afford consideration to other factors. Provided that the expert has offered rational support for his or her conclusion, the failure of an expert to consider other potentially meaningful factors will not vitiate an otherwise valid expert opinion. As expressed by our Appellate Division, "[t]he failure of an expert to give weight to a factor thought important by an adverse party does not reduce his testimony to an inadmissible net opinion if he otherwise offers sufficient reasons which logically support his opinion." Rosenberg, 352 N.J. Super. at 402 (citing State v. Freeman, 223 N.J. Super. 92, 115-116 (App. Div. 1988), certif. denied, 114 N.J. 525 (1989)); see also Glowacki v. Underwood Mem'l Hosp., 270 N.J. Super. 1, 16-17 (App. Div. 1994). It is the duty and function






of the factfinder at trial to determine "if the facts on which the answer of an expert is based actually exists, and the value or the weight of the testimony of the expert is dependent upon and [can] be no stronger than the facts on which it is predicated." Mohr v. B.F. Goodrich Rubber Co., 147 N.J. Super. 279, 284 (App. Div.), certif. denied, 74 N.J. 281 (1977)).

Here, the Appraisal Report and Mr. Brody's deposition transcript reflect that, in undertaking the subject property's valuation, Mr. Brody read, reviewed, and considered the following materials: (i) City of Newark v. Jefferson Township, 31 N.J. Tax 303 (Tax 2019), rev'd, 466 N.J. Super. 173 (App. Div. 2021); (ii) Newark v. West Milford, 9 N.J. 295 (1952); (iii) the Farmland Assessment Act of 1964; (iv) the conservation easements burdening the subject property; (v) reports from the State Farmland Evaluation Advisory Committee; (vi) reports by the Director of the Division of Taxation containing data on number of acres in West Milford assessed as woodland; (vii) the deposition transcript of Kenya Travitt; (viii) various sections of Appraisal Institute, The Appraisal of Real Estate (15th ed. 2020); (ix) Hancock Timberland Investors documents, 2008 to 2014; (x) sections of the Appraisal Institute, The Dictionary of Real Estate Appraising; and (xi) a copy of the appraisal report authored by Maurice Stack, SCGREA, on behalf of Newark for the local property tax appeal matter captioned City of Newark v. Jefferson Township. In addition, Mr. Brody conferred with Paul D. Gottlieb, Rutgers Department of Agricultural, Food, and Resources Economics and conducted site inspections of the subject property on foot and by car.[7]

---

[7] Although the court makes no finding herein whether Mr. Brody will, at trial, be qualified by the court as an expert in the property valuation field, the court notes that: (i) Mr. Brody's Appraisal Report reveals that he is a State of New Jersey Certified General Real Estate Appraiser; (ii) his deposition testimony reflected that he has been appraising real property for 59 years; and (iii) approximately fifty percent (50%) of his practice is devoted to local property tax appeals.






Mr. Brody's Appraisal Report details that the subject property is in West Milford's R-4 Low Density Residential Zone. The Appraisal Report highlights that section 500-7 of West Milford's zoning ordinance recites that:

> R-4 District recognizes the existing physical constraints of the rugged topography and the limitations that the soil and geologic conditions present for adequate drainage and filtration of septic effluent. Limited development on large lots is the objective considering the practical unavailability of sewers and central water facilities, the remoteness from improved road access and the desire to continue the rural character of development still prevailing in these areas of the Township. Residential clustering shall be permitted in his zone to conserve open space and environmentally sensitive land areas . . .
>
> The R-3 and R-4 Zones further provide for appropriate outdoor recreation activities and tourism opportunities in compatibility with the environment and rural character of the Township.

The Appraisal Report further sets forth that "the subject Newark Watershed properties are restricted in use and development by several factors including Conservation Easement, the Highlands Protection Act, the Watershed Moratorium Act & other restrictions and therefore none of the 'permitted uses' are applicable." The Appraisal Report details alleged historical information about Newark's watershed, including that:

> West Milford is in the Pequannock River watershed. Since 1900, The Pequannock River has been the source of water for the City of Newark . . . To protect the quality of its new water supply, in the early 1900's the City acquired approximately 55 square files [sic] of the watershed. Approximately 25.7 square miles, or 16,458 acres, of Newark's land in the Pequannock watershed are located in West Milford.

The Appraisal Report contains details about West Milford's roadways, public transportation, economy, and shopping. The Appraisal Report expresses that "[n]early 40 percent of the Township [of West Milford] is owned by the State of New Jersey, Passaic County, the






Federal Government, or the Town of West Milford. Another 32 percent is owned by the City of Newark." The Appraisal Report recites that as of October 2013, approximately 4,121 acres of land in West Milford, and as of October 2020, approximately 3,368 acres of land in West Milford, were used for the production and sale of wood under the Farmland Protection Act of 1964.

The Appraisal Report contains further details and information about the physical setting of the subject property, including that: (i) the land is remote; (ii) possesses severe slopes and rock outcroppings; (iii) does not have road access and does not have access to electricity or other utilities; and (iv) some portions of the subject property are flat and have appropriate access and frontage and would be developable "were it not for the conservation easements." Moreover, the Appraisal Report notes that two large reservoirs are contained within the subject property, and two other reservoirs are partially located within West Milford. The Appraisal Report highlights that these reservoirs support a variety of fish species, and that the subject property also supports a variety of endangered, threatened, and declining wildlife species, including migratory birds.

The Appraisal Report contains details about the Watershed Moratorium Act, N.J.S.A. 48:2-23.1, the Highlands Water Protection and Planning Act, N.J.S.A. 13:20-1, and the conservation easements impacting the subject property.

The Appraisal Report states that "[b]eginning in 1998 and continuing through 2006, the City of Newark sold conservation easements to the New Jersey Department of Environmental Protection." According to Mr. Brody, the conservation easements provide that no trees, shrubs, or other vegetation within the easement area shall be destroyed unless Newark and the New Jersey Department of Environmental Protection ("NJDEP") "deems it necessary for the maintenance of existing roads or trails, or for other water supply or conservation purposes, including wildlife






habitat management, forest fire prevention, or conservation-related purposes." In addition, Mr. Brody expressed that the conservation easements further prohibit topsoil, sand, gravel, loam rock, or other natural material from being excavated, dredged, or removed from or placed on the easement area without the consent of the NJDEP. Moreover, according to Mr. Brody, the conservation easements expressly prohibit the construction of any building or structure on the subject property and the construction of any roads for motorized vehicles without the consent of the NJDEP, except within two designated areas, one on block 12001, lot 26, and the other on block 14402, lot 1. The Appraisal Report further states that the conservation easements provide that the "easement will benefit the public by virtue of preserving the easement area in its natural state and allowing pedestrian access along existing and currently utilized interior trails operated by the grantor. The City of Newark, or its agent, will continue to allow public access and may charge reasonable fees and impose reasonable rules for access, as it currently allows by means of a public permit system."

Thus, based on Mr. Brody's review of the above-referenced materials, he concludes that the following activities are expressly prohibited on the subject property:

> A. Subdivision and Development. Any new development or subdivision of the property is expressly prohibited.
>
> Construction of billboards and cellular phone towers, golf courses, airstrips and helicopter pads are expressly prohibited on the property. Construction of any new structures, including but not limited to residential and agricultural structures, is expressly prohibited with the exception of water supply features on not more than 10% of the easement area which may be repaired and replace at their current locations without further permission from the Grantee.
>
> B. Mining. No topsoil, sand, gravel, loam, rock, or other minerals shall be deposited on, excavated, dredged, or removed from the






property.

C. Roads. No new roads may be constructed, or other portions of the property covered with concrete, asphalt, or any other paving material.

D. Trash. No dumping or placing of trash or waste material shall be permitted on the Property.

E. Natural resource protection. Clear cutting of timber stands is expressly prohibited.

However, select trees may be cut to: control insects and disease; to prevent personal injury and property damage; for firewood to be used for on-site domestic purposes; and for, [p]reservation of plant and animal species and natural communities described in the easement. Such selective cutting shall be done under the supervision of a New Jersey State Forester, and with prior approval of the Grantee. Any commercial timber harvesting on the property shall be conducted on a sustainable yield basis and in accordance with an approved Forest Stewardship Plan.

However, Mr. Brody highlights that the subject property is presently being used "for passive recreation supported by the sale of permits for fishing, boating, hiking, hunting, trapping, and horseback riding. Permits are sold by the Recreation Department located at 223 Echo Lake Road, West Milford. For the past several years, it has also been possible to buy a permit on the internet." He then details the income that has been apparently derived by Newark from the sale of permits on the subject property between 2014 and 2021, ranging from $67,726 to $114,974 annually.

Thus, in conducting his highest and best use analysis, Mr. Brody states:

I started the process of determining the highest and best use of the subject property by considering five possible uses. I started with two uses to which the property is being put and three others to which it could conceivably be put.

   

> Integrated water utility
> Passive recreation
> Commercial timber harvesting.
> Growth and sale of firewood
> Development in accordance with West Milford's zoning ordinance.

However, Mr. Brody observes that because the subject property is assessed under N.J.S.A. 54:4-3.3,

> consideration of any improvements such as dams, water treatment facilities, or pipelines [is precluded]. I have also been advised that the caselaw confirms that N.J.S.A. 54:4-3.3 precludes a valuation approach based upon integrated water supply utility purposes. In re Appeal of East Orange, 80 N.J. Super. 219 (App. Div. 1963). Therefore, based on legal instruction, I did not further consider integrated water utility in my determination of the highest and best use of the property.

In continuing with his highest and best use analysis, Mr. Brody next observes that:

> Passive recreation, in the form of fishing, hiking, or trapping, is physically possible and legally permissible. The conservation easements specify that the owner must continue to allow pedestrian access along existing and currently utilized trails and allow for public access for hunting and fishing for which it may charge reasonable fees.

> Newark sells permits to the public to use the property for these purposes. Gross revenue for the entire 35,000-acre watershed property amounts to approximately $100,000 per year. The greater part of the revenue is derived from permits for fishing and boating. Anyone who considered purchasing the subject property for permitted recreational purposes would consider not only the income generated by the use but the expense necessary to achieve the income. Among the categories of expense associated with the permitted recreational use are:

> > The expense associated with selling permits.
> > The expense associated with patrolling the property.
> > The expense associated with insuring the property.
> > Property Taxes.
> > Management.






> Although the expense necessary to maintain such use is not known, it is apparent that the expenses exceed the potential gross income. Even if a net operating income could be achieved, the value would be nominal.

Mr. Brody then makes the following assumption under the Appraisal Report, stating that:

> If one were to assume $100,000 Gross Potential Income, (see 'Use of the Property'), five percent expenses, NOI $95,000, a capitalization rate of 8.3 percent (5% and a 3.3% component) the value would be $1,144,578 or $69.55 per acre.

> There is no easy way to determine the proper capitalization rate for income generated from permitted recreational uses.

> Ideally, capitalization rates are derived from the sale of income-producing property with the same highest and best use as the subject. As far as I can determine, other than admission fees to state or county parks, there is no other comparable property, in New Jersey, that derives income from the sale of permits for passive recreation like the subject property.

> I examined capitalization rates (see Addenda D) from American Council of Life Insurers (ACLI), Price Waterhouse Coopers Investor Survey (PwC), Real Estate Research Corporation (RERC). Because none of these recognized sources provide capitalization rates for income derived from passive recreation, I examined capitalization rates for other property uses. For the years 2013 through 2020 capitalization rates ranged from:

> Industrial Warehouse     6.0% to 8.3%.
> Strip Shopping Centers     7.0% to 8.2%
> Suburban Office     7.2% to 8.5%

> I used 5% for demonstration purposes. Even had I used a capitalization rate of 1% plus the tax component of 3.3% the value would be $2,200,000 or $133 per acre.

> It is doubtful that anyone would assume the risk.

In addition, in detailing the steps that he followed in performing his highest and best use analysis, Mr. Brody further expressed in the Appraisal Report that,






> [t]he conservation easements prohibit cutting trees unless it is necessary to maintain existing roads or trails, water supply or conservation purposes, including wildlife management and fire prevention. Clear cutting is expressly prohibited. After reading the sworn testimony in the recent Jefferson v. Newark trial, and Judge Bianco's opinion in that matter, I have concluded that there is no market for commercial timber operations in New Jersey. Commercial Timber harvesting is neither legally permissible nor financially feasible.

Accordingly, Mr. Brody concludes under the Appraisal Report that, because N.J.S.A. 54:4-3.3, "the statute which permits the assessment of the subject property, precludes consideration of improvements such as dams, water treatment facilities, and valuation as an integrated water supply utility. There is no other legally permitted use that is financially feasible. In my opinion, the subject property does not have a highest and best use."

Despite reaching a conclusion that the subject property does not have a highest and best use, and that, "it is not financially feasible to use the property for the permitted recreational uses," Mr. Brody's Appraisal Report further states that he, "considered whether there was, nevertheless, a market for the property. In other words, who might purchase the property subject to the conservation easements that precluded all development? Subsumed in that question; what would be the motivation behind such a purchase?"

Mr. Brody then delineates his consideration of the purchase of the subject property by the "State of New Jersey Department of Environmental Protection's Green Acres Program, Passaic County, the Trust for Public Land, the New Jersey Conservation Foundation, the Land Conservancy of New Jersey, [and] similar organizations . . . for passive recreation" activities. However, in Mr. Brody's opinion,

> These organizations are not concerned with financial feasibility. But none of these organizations purchase land because they want it






used for passive recreation. Rather, it is my understanding that these organizations purchase the land to stop development. In other words, they purchase land to prevent it from being used for its highest and best use. Because the land has development potential, they must pay at least as much as a developer would pay for the land. Furthermore, they do so with the knowledge that the land will become tax-exempt. Even though these organizations purchase land that is ultimately used for passive recreation, it is inconceivable that they would purchase the land if it was subject to taxation with values based on development potential.

Even if an organization was motivated to purchase land, not to stop development, but to add to the supply of land that could be used by the public for passive recreation, it would not purchase the subject property because the subject property is already dedicated to such use in perpetuity. Even if such an organization existed, it would not be in the market for the subject property.

Therefore, Mr. Brody concludes that "there is no market for the subject property. The subject property does not have a market value."

Observing that "[t]here is a market for the growth and sale of firewood in West Milford. [Finding] [a]pproximately 3,500 acres are devoted to that use," Mr. Brody's Appraisal Report recites that, "I have been asked to determine a value using a hypothetical condition that the sale of firewood is legally permissible."[8] [9] The Appraisal Report then details the differences between a hypothetical condition and an extraordinary assumption. According to Mr. Brody, in attempting to discern a value of the subject property under the hypothetical conditions, assuming the highest and best use of the subject property is for the sale of firewood,

---

[8] Mr. Brody's deposition revealed that Newark's legal counsel in these matters asked him to value the subject property employing hypothetical conditions.
[9] According to Mr. Brody, there were two hypothetical conditions, that: (i) it is legally permissible to sell firewood from the subject property; and (ii) it is financially feasible to sell firewood from the subject property. In Mr. Brody's opinion, the conservation easements permitted the harvesting of firewood from the subject property, however, would not allow the sale of the firewood, rather any firewood harvested would have to be "used within the property."






the first step was to determine whether the sale of firewood is financially feasible. I examined data promulgated by the Director of the Division of Taxation each year as to the number of acres assessed as woodland under the Farmland Assessment Act of 1964. That data indicates that in West Milford, there were, on average, 3,575 acres assessed as woodland between 2013 and 2021. At first blush, this would appear to indicate that it is financially feasible to use land in West Milford for the production and sale of firewood. That is not necessarily true. It may be that it would not be financially feasible to use the land for that purpose without a tax incentive to do so.

The New Jersey Farmland Assessment Act of 1964 permits woodlands, that are actively devoted to horticultural use, to be assessed at their productivity value. For woodland to be eligible for farmland assessment, the land must consist of at least five contiguous acres. Gross sales must average at least $500 per year for the first five acres plus $0.50 per acre for any additional acres. For example, a 100-acre parcel could be eligible for farmland assessment with the sale of wood averaging only $547.50 per year. ($500 First 5 acres and $0.50 x 95 acres = $47.50 + $500 = $547.50).

Land that consists of lakes, ponds, streams, buffer areas, hedgerows, wetlands, and irrigation ponds that are supportive and subordinate or reasonably required for the purpose of maintaining horticultural uses on a tract of land are also considered to be actively devoted to horticultural use, as long as there are at least five acres of land that would otherwise qualify as actively devoted to horticultural use. N.J.S.A. 54:4-23.1 to N.J.S.A. 54:23.5.

In effect, what the Farmland Assessment Act does is to permit the qualified land to be assessed 'as if' its highest and best use was for horticulture instead of based on its highest and best use for development.

However, for non-appurtenant woodland to qualify for farmland assessment the landowner must establish and comply with a woodland management plan prepared in accordance with the guidelines and practices approved by the Department of Environmental Protection. The forest management plan is designed to eliminate excessive and unnecessary cutting. The landowner and a forester from a list of foresters or other professionals approved by DEP must annually attest compliance with the forest management plan. N.J.S.A. 54:4-23.3.






> To assist in corroborating the economic costs associated with creating and maintaining a woodlands management plan I spoke with Donald Donnelly, SAF, LTE, TSP, a NJ Approved Forester with the Department of Environmental Protection Division of Parks and Forestry, NJ Forest Service. I included in Addenda B of this report a document found on-line listing their responsibilities.

Based on his discussions with the forester, Mr. Brody determined that the costs for developing a woodlands management plan would be approximately $2,000 and the annual maintenance of the plan would be approximately $175 to $200 per year. In addition, the estimated costs for cutting and removing the trees, splitting the wood, loading it onto a truck, hiring contractors to perform the work, etc. would range from $750 to $1,000. Thus, after amortizing the costs associated with a woodlands management plan and annual costs associated with same, Mr. Brody concluded that "[t]he overhead cost associated with a woodland management plan exceeds the minimum revenue qualifying for farmland exemption. Therefore, it does not appear that the sale of wood under a woodland management plan is financially feasible without a tax incentive."

Accordingly, Mr. Brody endeavored to ascertain whether the subject property would qualify as non-appurtenant woodland under the Farmland Assessment Act. According to Mr. Brody, non-appurtenant woodland "is land that qualifies for farmland assessment but is not part of an otherwise qualified farm." Finding that the subject property would qualify as non-appurtenant woodland, Mr. Brody then reviewed the New Jersey Farmland Evaluation Committee's published range of values, per acre, for non-appurtenant woodland in Passaic County and found the valuation methodology employed therein to be "sound." Accordingly, to discern his concluded land values for the subject property, Mr. Brody applied the Group B, per acre values established by the New Jersey Farmland Evaluation Committee for non-appurtenant woodland in Passaic County (ranging






from $150 to $158 per acre) and applied those values to the subject property's 16,458 acres.

In addition, Mr. Brody's deposition revealed the following substantive information: (i) Mr. Brody has been appraising real property in New Jersey for fifty-nine (59) years; (ii) in Mr. Brody's opinion, the Uniform Standards of Professional Appraisal Practice do not require a finding of highest and best use in determining market value; and (iii) in his professional appraisal experience, he could not recall any other instance where he found a property had no highest and best use.

However, Mr. Brody's deposition also revealed several potential missteps and errors in his analysis. For example, when evaluating the highest and best use of the subject property for commercial timbering operations, Mr. Brody made no inquiry to a certified forester to discern whether the subject property could generate a positive net operating income from commercial timbering operations. Mr. Brody stated, "I [did] no research [regarding the production use and sale of renewable forest products from the subject property] other than read Judge Bianco's decision [in City of Newark v. Jefferson Township] . . . saying that timber was not a highest and best use and the New Jersey Tax Court judge's decision and opinion and . . . I did not do independent research." Specifically, in response to West Milford's deposition question that "other than your interpretation of the Court's opinion [in Newark City v. Jefferson Township] that commercial timbering could not be a highest and best use . . . , you did no further study or analysis to determine whether or not commercial timbering could be a highest and best use," Mr. Brody responded, "[t]hat's correct."

Thus, Mr. Brody admittedly performed no analysis of the potential for commercial timbering operations on the subject property as a highest and best use because of Judge Bianco's decision in Newark City v. Jefferson Township. Consequently, Mr. Brody acknowledged during






his deposition that he did not analyze the potential capitalization rates for commercial timbering operations because he found that commercial timbering was not a potential highest and best use for the subject property.

In addition, Mr. Brody further testified during his deposition that he did not consider a highest and best use of the property for open space and conservation because he deemed it not financially feasible. In Mr. Brody's opinion, "conservation is not a use, but it's the motivation of the buyer or the user of the property, to use it for some -- some purpose. But it's . . . not a use from the standpoint of my interpretation." Mr. Brody further expressed the viewpoint that conservation and open space were not "uses that I would consider to even have a possibility of a financial analysis capabilities . . . it's just . . . there's no way you can put a financial number on those things."

However, after being presented with the court's conclusions in East Orange City v. Livingston Twp., 15 N.J. Tax 36 (Tax 1995) and Jersey City, Div. of Water v. Parsippany-Troy Hills Twp., 16 N.J. Tax 504 (Tax 1997), finding that the highest and best use of those properties were for open space and conservation, Mr. Brody acknowledged that "possibly, yes," he should have considered conservation and open space as potential highest and best uses for the subject property.

Moreover, Mr. Brody acknowledged during his deposition that he did not examine the marketplace to discern the reasonableness of the fees being charged by Newark for recreational permits. Mr. Brody further acknowledged that he was unaware whether Newark advertised the recreational activities available on the subject property, other than on Newark's website, including what the costs were associated with such advertisements.






Here, based on the motion record, the court finds that it cannot conclude, as a matter of law, that the opinions of Mr. Brody contained in the Appraisal Report are so bereft of factual support as to constitute an inadmissible net opinion. The record reveals that Mr. Brody relied on facts, data, and analysis that are regularly employed by experts in the property valuation field, for support of his opinion, that the subject property has no highest and best use. Moreover, the record further reveals that Mr. Brody evaluated and relied upon the New Jersey Farmland Evaluation Committee's published value ranges, per acre, for non-appurtenant woodland to derive a value conclusion for the subject property, as of each valuation date involved herein.

The court acknowledges that Mr. Brody's deposition revealed that he may have failed to afford adequate consideration to certain key factors and elements in arriving at his conclusions. While Mr. Brody's failure to consider certain factors in reaching his conclusion may render his opinions less credible, it does not wholly reduce his expert opinion to an inadmissible net opinion. As stated above, Mr. Brody offered sufficient reasons to logically support his conclusions. It is the function and duty of the factfinder during trial to resolve issues of witness credibility and decide how much or little weight should be accorded those opinions, not the motion judge.

D.   N.J.R.E 104 hearing

It is well-established that judges sitting as factfinders are assumed to be "capable of sorting through admissible and inadmissible evidence without resultant detriment to the decision-making process . . . ." State v. Kern, 325 N.J. Super. 435, 444 (App. Div. 1999). Here, the subject property's highest and best use, and the concomitant valuation issues to be presented, are both contested and complex. Consequently, the trial will likely be protracted, resulting in the litigants having to bear significant costs and expenses for their legal counsel and multiple experts to appear






in court. Our Supreme Court has cautioned that trial courts should "always be mindful of the time and money both taxpayers and municipalities must spend litigating these actions." Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 277 (1985).

Because trial in these matters will be conducted as a bench trial, and West Milford and Newark will not be unduly prejudiced by the court having to sort through admissible and inadmissible evidence during trial, the court finds that the interests of judicial economy and minimizing costs and expenses to be borne the litigants, the court is adequately equipped to resolve any evidentiary matters at trial. Therefore, a N.J.R.E. 104 hearing is unnecessary.

Accordingly, for the foregoing reasons, the court denies West Milford's motions for summary judgment and declines to conduct a N.J.R.E. 104 hearing.

Very truly yours,


Hon. Joshua D. Novin, J.T.C.




